ACCEPTED
06-14-00094-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
3/19/2015 10:52:36 AM
DEBBIE AUTREY
CLERK

# CASE NO. 06-14-00094-CV

IN THE SIXTH COURT OF APPEALS
TEXARKANA, TEXAS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
3/19/2015 11:05:00 AM
DEBBIE AUTREY
Clerk

Nancy Elizabeth Bowman,

Appellant,

vs.

Jerry Davidson and
Diana Davidson,

Appellees.

On Appeal from the 71st Judicial District
Harrison County, Texas
Cause No. 13-0618
The Honorable Brad Morin, Presiding

## BRIEF OF APPELLANT

JACK M. SANDERS, JR.
State Bar No. 17592000
109 East Houston Street
P.O. Box 1387
Marshall, Texas 75671-1387
(903) 935-7172
(903) 938-8616 (Fax)
sanders.jack@sbcblobal.net
ATTORNEY FOR APPELLANT

**ORAL ARGUMENT REQUESTED**

## **Preamble**

COMES NOW NANCY ELIZABETH BOWMAN, Appellant herein, who hereby respectfully makes and files this, her Appellant's Brief.

In the interest of clarity, Nancy Elizabeth Bowman will be referred to as "Bowman," while JERRY DAVIDSON, Appellee herein, will be referred to as "Jerry", and DIANA DAVIDSON, the other Appellee herein, will be referred to as "Diana." Collectively, the Appellees will be referred to as "the Davidsons."

In this Brief, the Reporter's Record will be cited by volume and page:line as "___ RR ___:___", the Reporter's Supplemental Indexes will be cited as __ R. Supp. R. Index, the Clerk's Record will be cited by page as "CR _____," the Clerk's Supplemental Records will be cited as "____ C. Supp. R. ___" and the plaintiff's exhibits will be cited by record volume and exhibit number as "4 RR P.Ex. ____." The Appendix will be referred to as "Appx. ____."

## Identity of Parties and Counsel

Pursuant to Tex. R. App. P. 38.1(a), Bowman hereby submits a list of parties and counsel interested in this case:

Appellant and her Appellate/Trial Counsel:
Nancy Elizabeth Bowman
c/o Jack M. Sanders, Jr.
State Bar No. 17592000
109 East Houston Street
P.O. Box 1387
Marshall, Texas 75671-1387
(903) 935-7172
(903) 938-8616 (Fax)
sanders.jack@sbcblobal.net

Appellees and their Trial Counsel:
Jerry and Diana Davidson
c/o Alan E. Brown
State Bar No. 03090500
Boyd & Brown, P.C.
1215 Pruitt Place
Tyler, Texas 75703
(903) 526-9000
(903) 526-9001 (Fax)
aebrown@suddenlinkmail.com

# Table of Contents

Preamble. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Identity of Parties and Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Index of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issues Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Legal Sufficiency of the Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    Factual Sufficiency of the Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . 6

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Bubba Bit a Long Time Friend of the Davidsons Prior to Biting Bowman.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    Bubba Had a History of Aggressive, Protective and Possessive Behavior. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.    Due to Bubba's Behavior, the Davidsons Warned New Guests At Their Home Not to Interact With Bubba. . . . . . . . . . . . . . . . . . 10

    D.    The Lawsuit and the Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

First Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Bowman was entitled to affirmative jury findings as a matter of law regarding the dangerous propensities of the Davidsons' dog and the Davidsons' knowledge of the dog's dangerous propensities, or in the alternative, the jury's findings was against the great weight and preponderance of the evidence.

Arguments Relating to the First Issue

A.   Strict Liability Claims Involving a Domestic Dog. . . . . . . . . . . . . . . 13

   1.   The Second Element of Dangerous Propensities. . . . . . . . . . . 14

   2.   The Third Element Requiring the Owner's Knowledge. . . . . 16

B.   The Record Contains Only Affirmative Evidence of Bubba's Dangerous Propensities and the Davidsons' Knowledge of the Dangerous Propensities. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   1.   There is No or Little Evidence to Support Bubba Did Not Have Dangerous Propensities and Affirmative Evidence to Support He Did. . . . . . . . . . . . . . . . . . . . . . . . . 18

   2.   No or Little Evidence to Support the Davidsons Did Not Know or Did Not Have Reason to Know Bubba Had Dangerous Propensities and Affirmative Evidence to Support They Did Have Knowledge. . . . . . . . . . . . . . . . . . . . 25

C.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Second Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      Bowman was entitled to an affirmative answer as a matter of law that the dog's dangerous propensities were the producing cause of Bowman's injuries, or in the alternative, a negative finding would have been against the great weight and preponderance of the evidence.

Arguments Relating to the Second Issue

    A.     Strict Liability Requires Bowman to Prove the Dangerous Propensities Were the Producing Cause of Bowman's Injuries.. . . . 31

    B.     The Record Contains Only Affirmative Evidence in Support of Bubba's Dangerous Propensities As the Producing Cause of the Bite.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    C.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Certificate of Compliance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# Index of Authorities

Cases

Texas Supreme Court

*Cain v. Bain,*
    709 S.W.2d 175 (Tex. 1986) (per curiam). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Collora v. Navarro*,
    574 S.W.2d 65 (Tex. 1978).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Croucher v. Croucher*,
    660 S.W.2d 55 (Tex. 1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Ford Motor Co. v. Ledesma*,
    242 S.W.3d 32 (Tex. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Holley v. Watts,*
    629 S.W.2d 694 (Tex. 1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Marshall v. Ranne,*
    511 S.W.2d 255 (Tex. 1974).. . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 16, 31

*Traylor v. Goulding*,
    497 S.W.2d 944 (Tex. 1973).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Washington v. Reliable Life Ins. Co.*,
    581 S.W.2d 153 (Tex. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27


Texas Courts of Appeal

*Allen ex rel. B.A. v. Albin*,
    97 S.W.3d 655 (Tex. App. — Waco 2002, no pet.). . . . . . . . . . . . . . . . . . . 13

*Beard v. Beard*,
    49 S.W.3d 40 (Tex. App. — Waco 2001, pet. denied).. . . . . . . . . . . . . . . . 6

*Belger v. Sweeney*,
836 S.W.2d 752 (Tex. App. — Houston [1st Dist.] 1992, writ denied).. . . 16

*Carrasco v. Stewart*,
224 S.W.3d 363 (Tex. App. — El Paso 2006, no pet.).. . . . . . . . . . . . . . . . 5

*Dunnings v. Castro*,
881 S.W.2d 559 (Tex. App. — Houston [1st Dist.] 1994, writ denied).. . . 15

*Farley v. M.M. Cattle Co.*,
549 S.W.2d 453 (Tex. Civ. App. — Waco 1977, writ ref'd n.r.e.). . . . . . . 15

*Machala v. Weems,*
56 S.W.3d 748 (Tex. App. — Texarkana 2001, no pet.). . . . . . . . . . . . . . . 6

*Owens v. Coury*,
614 S.W.2d 926 (Tex. App. — Amarillo 1981, no writ). . . . . . . . . . . 13, 15

*Plummer v. Estate of Plummer*,
51 S.W.3d 840 (Tex. App. — Texarkana 2001, pet. denied). . . . . . . . . . . . 6

*Raw Hide Oil & Gas Co., Inc. v. Maxus Exploration Co.*,
766 S.W.2d 264 (Tex. App. — Amarillo 1988, writ denied). . . . . . . . . . 5, 6

*Thompson v. Curtis*,
127 S.W.3d 446 (Tex. App. — Dallas 2004, no pet.). . . . . . . . . . . . 13, 31

*Villareal v. Elizondo*,
831 S.W.2d 474 (Tex. App. — Corpus Christi 1992, no writ). . . . . . . . . . 15

*Wells v. Burns*,
480 S.W.2d 31 (Tex. Civ. App. —El Paso 1972, no writ). . . . . . . . . . 13, 15

Out of State Cases

Supreme Court

*Poznanski ex rel Poznanski v. Horvath*,
 788 N.E.2d 1255 (Ind. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Deardoff v. Burger*,
 606 A.2d 489 (Pa. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Robinson v. Marino*,
 3 Wash. 434, 28 P. 752 (1892). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


Texas Rules of Appellate Procedure

Tex. R. App. Pro. 9.4(i)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Tex. R. App. Pro. 9.5(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Tex. R. App. Pro. 38.1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii


Other Authorities

Restatement (Second) of Torts § 509. . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16, 19, 20

## Statement of the Case

Nature of the
Underlying Case: Suit for personal injuries due to the Davidsons' dog attacking Bowman. CR 11-16.

Trial Court: The 71st Judicial District Court, Harrison County, Texas, the Honorable Brad Morin, Presiding.

Disposition: The Court entered Judgment for the Davidsons based on the Jury's findings. Appx. 1; 3A C. Supp. R. 4-5.

## Statement Regarding Oral Argument

Bowman believes oral argument is called for in this case. There are not many cases in Texas where strict liability has been found with regard to domestic animals. But this case is unique and fits squarely within the common law requirements for strict liability set out by the Texas Supreme Court years ago. Thus, this is an important case with regard to future dog bite cases and to the jurisprudence of this State.

Further, it is impossible to include all of the evidence presented during the three day trial which supports strict liability into this Brief. Thus, Bowman requests the opportunity to argue to the Court the main points of evidence which leave no question that the jury made incorrect findings as to strict liability in this case.

1

## **Issues Presented**

### First Issue

Bowman was entitled to affirmative jury findings as a matter of law regarding the dangerous propensities of the Davidsons' dog and the Davidsons' knowledge of the dog's dangerous propensities, or in the alternative, the jury's findings was against the great weight and preponderance of the evidence.

### Second Issue

Bowman was entitled to an affirmative answer as a matter of law that the dog's dangerous propensities were the producing cause of Bowman's injuries, or in the alternative, a negative finding would have been against the great weight and preponderance of the evidence.

## Summary of the Argument

Strict liability with regard to domestic animals is not a new concept in Texas. The law has long been if a dog has dangerous propensities, the owners knew or had reason to know about the dangerous propensities and the dog bites someone, as a result of the dangerous propensities, then the owners are liable, period. That is the law in Texas. The jury is charged with applying the facts of the specific case to the law. If the preponderance of the evidence support the elements, then the jury must enter the finding.

Here, the jury failed to follow the law, and thus, failed to enter the correct findings. There was overwhelming evidence presented at trial in support of the Davidsons' dog having dangerous propensities in the form of the protectiveness and aggression toward strangers. There was also overwhelming evidence at trial that the Davidsons knew from early on that Bubba exhibited such behaviors. The Davidsons even warned for safety of new guests to prevent a bite like what happened to Bowman. The law does not require an actual prior bite to show dangerous propensities. Yet, there is one in this case. Finally, there was overwhelming evidence at trial that Bubba's protectiveness and aggression toward strangers caused Bubba to bite Bowman. Despite all of the overwhelming evidence, the jury chose not to enter the correct finding. It may have been because they jury sympathized with the

3

Davidsons or disliked Bowman. The reason for the jury's failure to follow the law is irrelevant. Bowman is now entitled to seek this evidentiary review to correct the wrong based on the record. Accordingly, Bowman asks this Court to review the record in its entirety and reverse the jury's finding to Question No. 1 as to either Diana or Jerry and enter an affirmative finding as to Question No. 2.[1] Then, remand the cause back to the trial court for a determination as to damages alone.

---

[1]The Court of Appeals can reverse the jury finding as to Diana or Jerry alone and send the cause back to the trial court because either answer will lead to liability of a defendant.

## Standards of Review

When a party having the burden of proof appeals from an adverse fact-finding in the trial court, the point of error should be the matter was established as a matter of law or that the jury's finding was against the great weight and preponderance of the evidence. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). The specific standards as they relate to legal and factual sufficiency of the evidence are set forth below.

A.    Legal Sufficiency of the Evidence

Legal sufficiency points of error assert a complete lack of evidence on an issue. *Raw Hide Oil & Gas Co., Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex. App. — Amarillo 1988, writ denied). Legal sufficiency points are designated as "no evidence points" or "matter of law points," depending upon whether the complaining party had the burden of proof. *Id*. The appropriate legal sufficiency challenge here, as Bowman had the burden of proof for her strict liability claim, is a matter of law point. *Carrasco v. Stewart*, 224 S.W.3d 363, 367 (Tex. App. — El Paso 2006, no pet.).

In reviewing a matter of law point, the Court of Appeals must examine the entire record for evidence that supports the jury's finding, ignoring any evidence to the contrary. *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex. 1982). If no evidence to

5

support the finding is found, the Court of Appeals must then examine the entire record again to determine if a contrary position is established as a matter of law. *Id*.; *Plummer v. Estate of Plummer*, 51 S.W.3d 840, 841 (Tex. App. — Texarkana 2001, pet. denied).

B.    Factual Sufficiency of the Evidence

Factual sufficiency points of error concede conflicting evidence on an issue, yet maintain that the evidence against the jury's finding is so great as to make the finding erroneous. *Raw Hide Oil & Gas Co., Inc.*, 766 S.W.2d at 275. Factual sufficiency points of error are designated as "insufficient evidence points" or "great weight and preponderance points," depending upon whether the complaining party had the burden of proof. *Id*. The appropriate factual sufficiency challenge here as Bowman had the burden of proof for her strict liability claim is a great weight and preponderance point. *Beard v. Beard*, 49 S.W.3d 40, 55 (Tex. App. — Waco 2001, pet. denied); *Machala v. Weems,* 56 S.W.3d 748, 754 (Tex. App. — Texarkana 2001, no pet.). In reviewing a great weight and preponderance point, the Court of Appeals must examine the entire record to determine if there is some evidence to support the jury's finding, and then determine whether, in light of the entire record, the finding is manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex. 1973).

6

## Statement of Facts

This suit arises from the injuries Bowman suffered on the evening of June 24, 2012 as a result of Davidsons' dog biting her in the face. The Davidsons own two Australian Blue Heelers. 4 RR 87:19-24. Diana acquired the dogs, brother and sister, when they were six weeks old. 4 RR 88:6-9. The dog that bit Bowman was her 11 year old male Blue Heeler named Bubba.

### A. Bubba Bit a Long Time Friend of the Davidsons Prior to Biting Bowman

About a year before Bubba bit Bowman, he bit Billy Strong ("Strong"), a long time family friend. Appx. 3; 1 R. Supp. R Index, Video Deposition of Billy Strong;[2] 8 RR P. Ex. 20. The incident occurred when a repairman left his bag of tools inside the Davidsons' home. Appx. 3; 1 R. Supp. R Index, Video Deposition of Billy Strong. Diana asked Strong to take the bag of tools outside to the repairman before he had a chance to leave. *Id*. After Strong grabbed the tool bag, he took off at a trot towards the front door, and Bubba bit him on the back of the leg. *Id*. Bubba had a hold of Strong's leg and Diana had to holler at Bubba to turn Strong loose. 4 RR 99:24-100:3. Diana witnessed the entire event. 4 RR 99:16-19. She knew that Bubba laid his teeth on Strong and that Bubba had left a red mark and bruise on the

---

[2]For the Court of Appeals' convenience, in addition to citing to the video deposition included in the Reporter's Record in the Supplemental Exhibit Index, Bowman has also attached the line and page excerpt from Billy Strong's deposition that Bowman is relying on and that was included in the video shown the jury in the Appellant's Appendix, Tab 3.

7

back of Strong's leg. 4 RR 100:4-10; Appx. 3; 1 R. Supp. R. Index, Video Deposition of Billy Strong. Although the Davidsons do not always describe the prior incident with Strong as a "bite," Strong certainly does. Appx. 3; 1 R. Supp. RR Video Deposition of Billy Strong. He also thought the dog should have been put up after the incident whenever anyone came over to the Davidsons so it would not happen again. Appx. 3, 1 R. Supp. R. Index, Video Deposition of Billy Strong.

B.     Bubba Had a History of Aggressive, Protective and Possessive Behavior

Bubba generally does not have a problem with people he knows. 4 RR 100:17-20. However, he shows aggression toward strangers. 4 RR 100:21-22. Diana has known this all of Bubba's life. 4 RR 100:23-24. Both of the Davidsons admit Bubba is aggressive, protective and possessive. 4 RR 94:17-19; 4 RR 138:20-22, 146:19-23. Bubba is just not like other dogs. 4 RR 147:23-148:1. Diana frequently uses both aggressive and protective when describing Bubba. 4 RR 93:22-94:16. Diana knows Bubba is aggressive because he barks and jumps at the fence when people come to their house. 4 RR 94:20-22. She has signs up saying beware of the dogs because she wants people to beware of them and does not want to take the chance that Bubba will hurt someone by biting them. 4 RR 94:23-95:5, 95:9-11. Bubba acts protectively when anyone, including Jerry, gets between him and Diana. 4 RR 138:12-16, 138:24-25. Bubba is showing his protectiveness and possessiveness when he barks and pushes people away from Diana. 4 RR 139:5-7. Further, when Bubba gets between

8

Jerry and Diana, he is exhibiting a low level of aggression towards Jerry. 4 RR 138:12-15, 138:21-25; 5 RR 28:7-11. To have Bubba exhibiting such behavior towards Jerry, someone Bubba has also bonded with, is a red flag for dangerous behavior. 5 RR 28:12-18. The Davidsons put Bubba up when children come over because the children might get bit, 4 RR 102:9:17, and they put Bubba up also when there are a large number of people at their home that the dog does not know. 4 RR 103:18-24, 4 RR 140:18-24. There was a propensity for Bubba to be dangerous. 4 RR 147:6-22. The Davidsons' friends would even warn new guests about interacting with Bubba. 5 RR 24:24-25:7. Jerry testified that you never know what Bubba is going to do at any time or when he is going to blow up. 4 RR 149:13-14, 150:3-5.

Bowman also hired an expert to testify at trial in this case, Dr. Lore Haug ("Dr. Haug"), who is Board Certified Veterinarian Behavior. 5 RR 8:21. She also received additional training specifically in animal behavior. 5 RR 8:24-25. She works with animals with various levels and styles of behavior disorders, 5 RR 9:7-8, including dogs with aggressive tendencies. 5 RR 9:13-15. All of her opinions at trial were offered based on her training, education and experience. 5 RR 9:24-10:1. Dr. Haug testified that "protective" and 'territorial" are words that owners use to describe types of aggressive behavior. 5 RR 25:13-15. In the vast majority of cases, dogs only get worse when the owners do not do anything to stop aggressive tendencies. 5 RR 25:16-22. A dog that is possessive and protective can be a danger, 5 RR 25:23-25,

9

especially if the owners do nothing to train the dog. 5 RR 27:18-21. The Davidsons did nothing to properly train Bubba. 4 RR 89:14-15; 4 RR 130:17-18; 5 RR 27:18-21. Further, this protective and aggressive behavior does not fall within the range of a typical or normal companion dog. 5 RR 23:14-16. Moreover, Bubba biting Strong was not appropriate even for cattle herding dogs. 5 RR 29:13-15. Well socialized and trained dogs know the difference between a human being and cattle. 5 RR 38:10-17. With Bubba's past possessive and protective behaviors and the concern that prompted the Davidsons warnings, it was only a matter of time before someone got hurt. 5 RR 37:13-16. Dr. Haug is positive that the Davidsons recognized the risk Bubba posed to new guests. 5 RR 39:13-21.

C.      Due to Bubba's Behavior, the Davidsons Warned New Guests At Their Home
         Not to Interact With Bubba

Due to Bubba's aggressive nature, the Davidsons would warn guests who were strangers to the dog not to touch or look at the dog. 4 RR 93:19-25, 95:21-23, 4 RR 131:7-10. The warnings were given to protect people from a bite. 4 RR 95:24-96:4, 114:2-4, 4 RR 131:20-23. Jerry admitted they give the warnings about Bubba because they knew there was a propensity there for Bubba to bite. 4 RR 140:10-13. The Davidsons have been giving their warning about Bubba for a long period of time prior to Bubba biting Bowman. 4 RR 101:10-15. Diana just did not know if and when Bubba might act on his aggressive behavior. 4 RR 101:16-23. If in Bubba's

10

mind Diana was in danger, Bubba would become aggressive.  4 RR139:20-140:5.

Diana had reason to know that Bubba may be dangerous because she had reason to

know Bubba may bite someone. 4 RR 101:24-102:2.  The Davidsons warned people

that came to their home about Bubba because they were concerned that something

bad might happen.  5 RR 14:22-24.  Every client Dr. Haug has ever had that have

given warnings to people about their dogs have done so because the owners have

some knowledge about the dog's previous behavior that makes them concerned that

something bad is going to happen.  5 RR 17:3-7, 24:1-4.  There is no other reason to

give warnings unless something similar has happened in the past.  5 RR 17:7-8,

23:18-24:4, 24:20-22.  People that have normal dogs, without aggressive tendencies,

do not give warnings.  5 RR 17:9-12.

On the night of the occurrence, the Davidsons and their guests all sat down to

eat dinner at a table.  Diana led Bowman to sit down at the table right next to her.  4

RR 29:14-21.  There is no dispute as to where Diana and Bowman were sitting before

the attack. 4 RR 106:17-18.  Bubba sat on the floor in between Diana and Bowman

during the dinner. 4 RR 30:11-13.  Bubba always sat at the table next to Diana.  4 RR

106:19-22.  The seating arrangement was cramped due to the number of guests and

everyone was sitting close together. 4 RR 30:25-31:14; 5 RR 34:9-18.  It was noisy

in the room and Bowman leaned over towards Diana to tell her something.  4 RR

32:15-18; 4 RR 108:6-7, 110:13-16. At that point, Bubba jumped up and bit Bowman in the face. 4 RR 33:6-9; 4 RR 108:4-7.

D.    The Lawsuit and the Appeal

On August 5, 2013, Bowman filed suit against the Davidsons for strict liability and negligence in order to recover for her significant injuries caused by Bubba's bite. CR 11-16. On September 30, 2013, the Davidsons filed an Original Answer. CR 59-63. On August 19, 2014 the parties went to trial, 4 RR 6, and three days later the trial concluded with the submission of the charge to the jury. 6 RR 42; CR 1198-1209. On August 21, 2014, the jury returned their verdict answering "no" to the first question regarding strict liability for both Jerry and Diana. Appx. 2; CR 1198-1209. On August 28, 2014, a Judgment was entered by the Court. Appx. 1; 3A C. Supp. R. 4-5. On September 24, 2014, Bowman filed a Motion for New Trial or In the Alternative, Motion for Judgment Non Obstante Verdicto. 2A C. Supp. R. 4-7. The Trial Court held a hearing and denied Bowman's Motion. CR 1430. On November 24, 2014, Bowman filed her Notice of Appeal. CR 1433-1434. Now, Bowman seeks review with this Court of the jury's findings regarding dangerous propensities and producing cause.

**Arguments and Authorities**

First Issue
(Restated)

Bowman was entitled to affirmative jury findings as a matter of law regarding the dangerous propensities of the Davidsons' dog and the Davidsons' knowledge of the dog's dangerous propensities, or in the alternative, the jury's findings were against the great weight and preponderance of the evidence.

A.      Strict Liability Claims Involving a Domestic Dog

In Texas, as in many states, it has long been established that actions for damages caused by vicious domestic animals are governed by principles of strict liability. *Marshall v. Ranne*, 511 S.W.2d 255, 258 (Tex. 1974). The elements of a strict liability claim involving a dog are: (1) the defendant owned or possessed the dog; (2) the dog had dangerous propensities abnormal to its class; (3) the owner knew or had reason to know the dog had dangerous propensities; and (4) the dog's dangerous propensities were the producing cause of the plaintiff's injuries. *Id.; Thompson v. Curtis*, 127 S.W.3d 446, 451 (Tex. App. — Dallas 2004, no pet.); *Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 660 (Tex. App. — Waco 2002, no pet.); *Owens v. Coury*, 614 S.W.2d 926, 928 (Tex. App. — Amarillo 1981, no writ); *Wells v. Burns*, 480 S.W.2d 31, 33 (Tex. Civ. App. —El Paso 1972, no writ). The first element of a strict liability claim was not at issue in this case in that the Davidsons

13

readily admit they own Bubba, the dog that bit Bowman. 4 RR 87:19-22; 4 RR 130:11-14.

### 1. The Second Element of Dangerous Propensities

With regard to the second element, the plaintiff must prove dangerous propensities abnormal to other dogs. Despite the Texas Supreme Court's long ago recognition of strict liability as set forth in the Restatement, there are not many Texas cases where the elements of strict liability are discussed. Thus, it is helpful to look to other states Supreme Courts that adopted the Restatement elements for their explanation as to the elements as well as the Texas cases that have discussed the elements. Generally, all dogs, regardless of breed and size, are presumed to be harmless domestic animals. *Poznanski ex rel Poznanski v. Horvath*, 788 N.E.2d 1255, 1258 (Ind. 2003); Appx. 5.[3] The great majority of dogs are regarded as friends and companions of man. Restatement (Second) of Torts § 509 cmt. f. (adopted by the Texas Supreme Court in *Marshall,* 511 S.W.2d at 258); Appx. 8. They are harmless and if a dog is in the possession of characteristics dangerous to mankind, it should be regarded as abnormal. *Id*.

Although the majority of dogs are harmless, an owner has a right to keep a vicious dog for the necessary protection of life and property, provided that the owner

---

[3]The out of state cases are included in the Appellant's Appendix for the Court of Appeal's convenience.

14

takes proper precautions to preclude that viciousness from exhibiting itself. *Deardoff v. Burger*, 606 A.2d 489, 492 (Pa. 1992); Appx. 6.

Texas courts have previously held "dangerous propensities" means the dog must have had vicious, dangerous or mischievous propensities. *Villareal v. Elizondo*, 831 S.W.2d 474, 477 (Tex. App. — Corpus Christi 1992, no writ); *Owens*, 614 S.W.2d at 928; *Wells*, 480 S.W.2d at 33. This element addresses dogs that are vicious as well as animals that are not vicious, but have a dangerous tendency that is unusual and not necessary for the purposes for which such animals are usually kept. Restatement (Second) of Torts § 509 cmt. c.; *see also Farley v. M.M. Cattle Co.*, 549 S.W.2d 453, 456 (Tex. Civ. App. — Waco 1977, writ ref'd n.r.e.). Further, the animal's "class" is not limited to a specific breed of that animal. *Dunnings v. Castro*, 881 S.W.2d 559, 561 (Tex. App. — Houston [1st Dist.] 1994, writ denied) (no evidence suggesting Weimaraner had dangerous propensities that were abnormal compared to other dogs). Thus, behaviors that are not usual to dogs in general and that cause a concern for the safety of others is a dangerous propensity.

Other states have given a little more guidance as to "dangerous tendencies." A dangerous tendency has been defined by the Indiana Supreme Court as "a tendency of the animal to do any act that might endanger the safety of persons or property in a given situation." *Poznanski*, 788 N.E.2d at 1258; Appx. 5. A dog can even be found to have dangerous propensities based on the bite that is the basis of the suit.

15

*Id*. An unprovoked, intentional bite that is not classified as a playful nibble, even if it is the first bite, shows a dangerous propensity. *Id.* Barking and jumping at strangers as well as a prior bite has been found sufficient in other states to show a dog has vicious tendencies and to hold the defendant strictly liable. *Robinson v. Marino*, 3 Wash. 434, 28 P. 752, 753 (1892); Appx. 7.

### 2. The Third Element Requiring the Owner's Knowledge

The third element requires the plaintiff to prove the owner knew or had reason to know the dog had dangerous propensities. It is not necessary to the application of strict liability for the owner of the dog to know of its abnormally dangerous propensities. Restatement (Second) of Torts § 509 cmt. g; Appx. 8. It is enough that he have reason to know thereof. *Id.* Thus, it is not even necessary for the owner to know of a prior attack on humans. *Id.* A dog is no longer regarded as entitled to one bite. *Id.* It is enough that the owner knows that the dog on other occasions exhibited such a tendency to attack humans or other animals or otherwise do harm as should apprise him of its dangerous character. *Id.* The knowledge element may be fulfilled with evidence of either actual or constructive knowledge. *See Belger v. Sweeney*, 836 S.W.2d 752, 754 (Tex. App. — Houston [1st Dist.] 1992, writ denied). The term "reason to know" means information from which a reasonably intelligent person would infer that the animal has dangerous propensities. *Marshall*, 511 S.W.2d at 258-59.

B.    The Record Contains Only Affirmative Evidence of Bubba's Dangerous Propensities and the Davidsons' Knowledge of the Dangerous Propensities

A review of the record demonstrates that there is no evidence to support Bubba did not have dangerous propensities nor is there evidence that the Davidsons did not know or have reason to know of Bubba's dangerous propensities. Further, the converse is true, Bowman presented a great deal of evidence in support of Bubba's dangerous propensities and the Davidsons' knowledge. The parties submitted the second and third strict liability elements together in the following question and instruction to the jury in the Court's Charge:

Question No. 1

> On the occasion in question, did the Davidsons know or have reason to know that their dog had dangerous propensities not normal for a dog.
>
> "Reason to know" means the actor has information from which a person of reasonable intelligence would infer that the fact in question exists, or that such person would govern his conduct under the assumption that such fact exists.
>
> It is enough that the possessor of the animal knows that it had on other occasions exhibited such a tendency to attack human beings or other animals or otherwise do harm as should apprise him of its dangerous character. Thus, the fact that a dog has to his knowledge unsuccessfully attempted to attack human beings or animals is sufficient to bring its possessor within knowledge requirement. Sufficient also is any form of ill temper displayed in the presence of man or beast which would apprise a reasonable man that animal if uncontrolled would make such an attack.
>
> "Dangerous propensities" means vicious or aggressive tendencies that are not normal for a dog.

17

Answer "Yes" or "No".

Answer:     Jerry Davidson     _____

Answer:     Diana Davidson     _____

Appx. 2; CR 1201.  The jury answered "No" to both Jerry and Diana.  *Id.*

1.     There is No or Little Evidence to Support Bubba Did Not Have Dangerous Propensities and Affirmative Evidence to Support He Did

A review of the entire record demonstrates that there was no evidence to support the jury's findings. The Davidsons offered no evidence to prove Bubba's protectiveness was normal to all dogs, that Bubba was not unusual with regard to his behavior around strangers or Diana, or that when Bubba attacked Bowman it was not an aggressive or dangerous behavior.

Further, a second review of the record reveals significant evidence to show Bubba had dangerous propensities.  There are no Texas cases that hold the bite at issue can not be considered to determine whether the animal has dangerous propensities.  Bubba exhibited a dangerous propensity by viciously attacking Bowman without any provocation causing her severe injuries to her face.  4 RR 32:11-22.  Bubba made no noise or warning before he jumped up and attacked Bowman.  4 RR 32:24-33:6.  The Davidsons do not deny the attack nor do they deny the bite caused Bowman severe injuries.  Diana witnessed the attack. 4 RR 33:13-24.

18

Further, the Davidsons did not try to explain the bite as playful or something other than a vicious attack meant to injure Bowman.

Additionally, both Diana and Jerry described dangerous propensities in Bubba at trial. A "dangerous propensity" would include a prior bite of a human being. *See* Restatement (Second) of Torts § 509 cmt. c. Billy Strong described the prior incident to the jury through his deposition testimony as a bite.

Billy Strong:

> Q: Had Bubba bitten people, anybody before [Bowman] that you were aware of?
> A: Yes.
> Q: Who?
> A: Me.

Appx. 3; 1 Sup. RR Video Deposition of Billy Strong. Further, Diana and Jerry admitted that they knew Bubba bit Strong a year before the attack on Bowman.

Diana Davidson:

> Q: And I believe when Billy Strong got bit that you saw the bite. When Billy Strong got bit did you see the incident?
> A: I did.
> 4 RR 99:16-19.
>
> Q: So he had a hold of him at the pants leg?
> A: Yes.
>
> Q: And you know that it left a bruises?
> A: Yes.
>
> Q:So you agree that the dog laid teeth on Mr. Strong, a human being?
> A: I do know this, yes.

19

Q: And you saw it?
A: I did.

4 RR 100:2-10.  Jerry also admitted knowing that Bubba caused a red mark on Strong's leg.  4 RR 146:19-23.  Even with cattle dog instincts, Blue Heelers should know the difference between a cow and a human being.  5 RR 38:10-17.  There are no Texas cases affirming a finding of no strict liability when there was an admission of a prior bite.

If Bubba's bite that is at issue in this case or his prior bite were not enough, then Diana and Jerry's testimony regarding his protectiveness of Diana and aggressiveness towards strangers demonstrated dangerous propensities.  "Dangerous propensities" also mean dangerous tendencies that are unusual and not necessary for the purposes for which dogs are usually kept.  *See* Restatement (Second) of Torts, § 509 cmt. c; Appx. 8.  The Davidsons admit Bubba had a dangerous tendency to be aggressive, protective and possessive that was not like other dogs.  4 RR 94:17-19, 146:11-18.  He was protective of Diana, 4 RR 93:22-25, and Bubba had a problem with strangers all of his life.  4 RR 100:21-24.

Diana Davidson:

Q: And did you also tell her [Bowman] that the dog was aggressive?
A: I think, I don't know whether I said aggressive or protective.  He is very protective of me.

4 RR 93:22-25

20

Q: I asked you a question right here on Line 20. My question was, okay, what do you mean by aware of dogs. What was your answer?
A: The dog is aggressive, you know, if he doesn't know someone.

4 RR 94:7-11

Q: You said was protective also?
A: He is.

Q: So we have aggressive, protective, and possessive; is that correct?
A: Yes.

4 RR 94:15-19. When Bowman's counsel asked Diana why she described Bubba as aggressive, she said:

A: He is very verbal when strangers come up. He barks, jumps at the fence, he gives us the indication that, you know, he tells us that someone is there and all. So I have signs out saying beware of the dogs, because I want them to be aware of them. He has never bitten anybody, but I just didn't want to take the chance, because he does bark and jump at the fence when some stranger comes up.

Q: What chance don't you want to take?
A: I don't want to take any chances of any of our animals hurting anybody.

4 RR 94:21-95:5.

Q: Is it fair to say you didn't want to take the chance of the dog biting somebody?
A: That is right.

4 RR 95:9-11. Although Jerry testified that Bubba was not dangerous, the question is dangerous propensities or tendencies. In other words, a propensity or natural inclination to act dangerous. Jerry stated the following at trial in support of Bubba having "dangerous propensities":

21

Jerry Davidson:

Q: So, I realize your position is that the dog is not dangerous, correct?
A: Right.

Q: But you can't say that all your, your warnings all were there for there was this propensity for danger, correct? That is different from being dangerous.
A: Right.

Q: There was a propensity there; correct?
A: Correct.

4 RR 147:6-14. Further, Jerry testified that Bubba was very protective of Diana, 4 RR 130:22-131:6, 138:21-25, and had a clear dislike of strangers. 4 RR 136:16-20. Jerry admitted Bubba would bark and push him away from Diana when they danced and Bubba would do the same to anyone else that tried to get between the dog and Diana. 4 RR 138:21-25, 139:5-7. Jerry even admits someone leaning in toward Diana would be a threat to the dog. 4 RR 140:3-5. Dr. Haug testified that barking, jumping and pushing between Jerry and Diana is a low level aggression that is a red flag. 5 RR 28:7-18. If Bubba would act that way towards Jerry, Bubba would not hesitate to be more aggressive with a stranger. Further, Jerry admits that Bubba was different in that way from other dogs, 4 RR 147:23-148:1.

Lastly, whether you use the word protective, possessive or aggressive, Bubba exhibited dangerous behaviors that caused the Davidsons to warn all new guests not to interact with Bubba for fear that he would be protective of Diana and bite them.

22

4 RR 95:13-14, 95:21-25; 4 RR 131:12-15, 131:20-23. The Davidsons had been giving the warning about Bubba for a long time before Bubba bit Bowman. 4 RR 101:6-15. Further, not only did the Davidsons warn people, but their friends would even warn new guests about Bubba. 5 RR 24:24-25:7. Jerry admits that Bubba was protective in that he would stand his ground with Diana and that is also why Diana gave the warnings. 4 RR 130:22-131:10. Protective and possessive behavior generally just gets worse and worse over time if not formally corrected. 5 RR 25:16-22. So, if not corrected, protectiveness and possessiveness becomes dangerous. 5 RR 25:23-25. The Davidsons did not ever correct Bubba's behavior. 4 RR 89:14-15; 4RR 130:17-18; 5 RR 27:18-21. Bubba's behavior did not fit within the behavior of what is acceptable of a typical or normal dog. 5 RR 23:14-16. Diana herself admitted she had reason to know the dog might bite somebody and that was reason to know he [Bubba] might be dangerous. 4 RR 101:24-102:2. The Davidsons also testified as follows:

Diana Davidson:

> Q: Is it fair to say you didn't want to take a chance of the dog biting somebody?
> A: That is right.
>
> Q: That is why you warn them?
> A: I warned them, yes, because he is very protective of me and he does - - he, if he doesn't know someone he barks at them.

4 RR 95:9-15.

23

Q: So the cause of your warnings is him being aggressive?
A: Yes

Q: Your wanting to avoid a bite; correct?
A: Yes.

4 RR 95:21-25.

Jerry Davidson:

Q: Do you believe he would be aggressive if he, the dog, thought Diana was in danger?
Y: Yes.

4 RR 139:20-22.

Q: Okay. Well, that is why you give the warnings is because you knew the propensity was there for it [the bite] to happen?

A: Yes, that is the reason that they give the warning.

4 RR 140:10-13.

Q: There was a propensity there; correct?
A: Correct.

Q: Okay. And you knew that?
A: Well, like I say, I didn't give the warning?

Q: That was the reason, that was the reason for the warning?
A: That was the reason my wife gave the warning.

Q: Because of the propensity for danger?
A: Right.

4 RR 147:13-22. Accordingly, the Davidsons' own testimony demonstrates that they gave the warnings to new guests because of Bubba's protective and aggressive

tendencies and because they were afraid Bubba would bite someone if they did interact with the dog.

> 2. No or Little Evidence to Support the Davidsons Did Not Know or Did Not Have Reason to Know Bubba Had Dangerous Propensities and <u>Affirmative Evidence to Support They Did Have Knowledge</u>

Next, the record reveals that the Davidsons clearly knew or had reason to know of Bubba's dangerous propensities. First, the Davidsons were aware of Bubba's prior bite. Diana witnessed Bubba bite Strong. 4 RR 99:24-100:3. She had to call the dog off Strong to get him to let go of Strong's leg. 4 RR 99:24-100:3. Diana knew that Bubba bit or nipped Strong and left a bruise on his leg. 4 RR 100:4-10. Jerry also knew about the prior bite. 4 RR 146:19-23.

Second, both Diana and Jerry admit they warned new people to stay away from Bubba because they were afraid Bubba would bite someone. 4 RR 95:21-25, 101:24-102:2, 114:2-4; 4 RR 131:12-15, 131:20-23. Dr. Haug testified that every client she has had that gave warnings about their dog did so because they had some knowledge about the dog's previous behavior that made them concerned that something bad was going to happen. 5 RR 17:3-7. People give warnings about their dogs because the dog's behavior concerns them. 5 RR 17-12-14. Dr. Haug was positive that the Davidsons recognized the risk Bubba posed. 5 RR 39:10-21. Again, the Davidsons did not refute or contradict Dr. Haug's testimony.

Third, both Diana and Jerry describe Bubba as protective of Diana and as disliking strangers. Both Diana and Jerry repeatedly describe Bubba as aggressive, protective and possessive at different points during their trial testimony. 4 RR 94:17-19; 4 RR 138:20-22. Diana admits Bubba was that way all of his life. 4 RR 100-23-24. Further, Jerry admits that Bubba acts aggressive by barking and pushing anyone that gets too close to Diana. 4 RR 138: 12-15, 21-25. He had known about this behavior for a long time. 4 RR 139:1-4. Further, he understood the behavior was a part of Bubba being protective of Diana. 4 RR 139: 5-7. Diana herself admitted she had reason to know the dog might bite somebody and that was reason to know he [Bubba] might be dangerous. 4 RR 101:24-102:2.

A prior bite is not required to show dangerous propensities. The Davidsons' testimony at trial seemed to suggest that when Bubba bit Strong it was a playful bite. 4 RR 96:13-21. Therefore, the prior bite does not count and is irrelevant. But even if the Court believes this to be true, it does not change the Davidsons own testimony regarding Bubba's aggressiveness toward strangers and protectiveness of Diana. 4 RR 95:9-13;4 RR 130:22-131:6, 136:16-20, 138:21-25, 139:1-7. These are dangerous propensities and the Davidsons were well aware of them prior to Bubba biting Bowman.

Most, if not all, of the Davidsons' testimony evidencing knowledge of Bubba's dangerous propensities was solicited during Bowman's case in chief when the

Davidsons were called as adverse witnesses. If their testimony had been anything other than concise, clear and conclusive, they could have corrected their own testimony during the Davidsons' case in chief. However, in Davidsons' case in chief, only Diana testified (Jerry did not). In fact, the only question asked of Diana when she testified in her own case in chief by Bowman's counsel was:

Diana Davidson:

> Q: Mrs. Davidson, are you recanting any of your testimony from yesterday?
> A: I don't think so.

4 RR 157:21-23. In *Collora v. Navarro,* the Texas Supreme Court held a directed verdict may be based on the uncontroverted testimony of a party to the lawsuit when the testimony is clear, direct, positive and uncontradicted, is devoid of inconsistencies and is uncontradicted. *Collora*, 574 S.W.2d 65, 69 (Tex. 1978); *see also Washington v. Reliable Life Ins. Co.*, 581 S.W.2d 153, 159 (Tex. 1979) (holding the jury must believe an interested witness as a matter of law if their testimony is the only testimony on an issue and it is clear, direct and positive and is uncontradicted).

Clearly, if the jury has to believe a plaintiff's clear and concise testimony when the plaintiff has the burden of proof, the jury would certainly have to take the defendants, in this case the Davidsons' testimony, during Bowman's case in chief as true, without being able to pass on its credibility. This is especially true since the Davidsons had an opportunity to recant or rebut the testimony in their own case in

chief, but failed to do so. The Davidsons called no expert witnesses. Further, the knowledge of the other witnesses called by the Davidsons is not at issue in this case. The Davidsons' knowledge of their own dog's propensities to be dangerous is the question for the jury. The other lay witnesses cannot be said to have contradicted the Davidsons' own admissions to their knowledge of Bubba's dangerous propensities. There is no question to the jury as to what others observed or believed. The Davidsons' testimony must be relied upon as credible. According to the Texas Supreme Court, the jury cannot disregard the Davidsons' testimony for any reason and must take it as true. Thus, the jury had no option, but to find the Davidsons strictly liable as a matter of law, period.

If the Court finds some evidence in the record to support the jury's finding, a factual sufficiency review of the evidence reveals the jury's findings as to Question No. 1 for both Jerry and Diana were against the great weight and preponderance of the evidence. Thus, although there may be some conflicting evidence on the issue, the evidence against the jury's findings to Question No. 1 is so great as to make the jury's findings erroneous and subject to reversal. Accordingly, Bowman asks the Court of Appeals to reverse the jury's findings of "no" to Question No. 1 as to Diana and/or Jerry and enter findings of "yes." Because there is legally and factually insufficient evidence in support of the jury's findings, the jury's findings should be reversed.

C.    Conclusion

The Davidsons clearly wanted Bubba to be protective and possessive of Diana so she would be protected when Jerry was out of town with work. 4 RR 139:8-16. Bowman is not claiming the Davidsons were wrong to want or even encourage protectiveness in their dog. But as Dr. Haug testified, protectiveness is a behavior that can have a tendency or propensity toward danger. 5 RR 25:16-25, 26:2-3. Thus, it is the dog owner's responsibility to train a dog with regard to when to be protective and with whom. 5 RR 27:1-17. Further, if the owners do not properly train their dog, then they have the responsibility to remove the dog from situations where the dog may act protectively in inappropriate situations. 5 RR 25:23-27:17. The Davidsons had the ability and knowledge to know when a dog had dangerous propensities and to protect guests because they had a dog named, Maggie, before Bubba and always kept her up when people came over. 5 RR 31:16-32:2; 5 RR 150:4-18.

The Davidsons knew gatherings involving strangers in their home were situations when the dog would act protectively or the Davidsons would not have warned all new guests about the dog, 4 RR 95:13-14, 95:21-25, 4 RR 130:22-131:10, or put the dog up when there was a large gathering. 4 RR 103:18-24. It was only a matter of time before someone got hurt. 5 RR 37:13-16. Yet the Davidsons did not train the dog, 4 RR 89:14-15; 4 RR 130:17-18; 5 RR 27:18-21, nor did they always put the dog up. In order to satisfy the elements of strict liability with domestic dogs

29

all Bowman had to prove was dangerous propensity and knowledge. She did so through the Davidsons' own testimony at trial. The fact that the jury answered "No" to Question No. 1 may reflect the jury's dissatisfaction with the law, but it was not within their power to chose to follow the law or not. The evidence in the record fulfills the second and third elements of the claim as a matter of law or the evidence is so overwhelmingly in support of affirmative findings as to justify reversal. Accordingly, Bowman asks the Court to follow the law and reverse the jury's findings as to both Jerry and Diana for Question No. 1.

Bowman was entitled to an affirmative answer as a matter of law that the dog's dangerous propensities were the producing cause of Bowman's injuries, or in the alternative, a negative finding would have been against the great weight and preponderance of the evidence.

A.     Strict Liability Requires Bowman to Prove the Dangerous Propensities Were the Producing Cause of Bowman's Injuries

Bowman is also entitled to a finding that Bubba's dangerous propensities were the producing cause of her injuries. With regard to the last element, Bowman has conclusive evidence to prove Bubba's dangerous propensities were the producing cause of her injuries. *Marshall*, 511 S.W.2d at 258. A "producing cause" is a substantial factor in bringing about an injury, and without which the injury would not have occurred. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007). This definition includes the essential elements of producing cause: (1) the cause must be a substantial cause of the event at issue and (2) it must be a but-for cause, namely without which the event would not have occurred. *Id.* Proof of producing cause involves a lower burden than proof of proximate cause, because proof of producing cause does not require a showing of foreseeability. *Thompson*, 127 S.W.3d at 451.

B.     The Record Contains Only Affirmative Evidence in Support of Bubba's Dangerous Propensities As the Producing Cause of the Bite

Although the jury did not answer Question No. 2 regarding producing cause in the Court's Charge, the evidence in the record, either as a matter of law or because

the great weight and preponderance of the evidence supports it, entitles Bowman to an affirmative answer to the question of whether Bubba's dangerous propensities were the producing cause of Bowman's injuries. As set forth above, the Davidsons admit Bubba was aggressive, protective and possessive. 4 RR 94:17-19; 4 RR 146:11-18. Bubba was very protective of Diana, 4 RR 93:22-25, and had a clear dislike of strangers. 4 RR 100:21-24. These dangerous tendencies were the producing cause of Bubba's bite. On the night of the occurrence, Bowman sat next to Diana at the dinner table. 4 RR 29:14-21; 4 RR 106:17-18. She was leaning toward Diana when Bubba bit her in the face. 4 RR 32:15-18; 4 RR 108:6-7, 110:13-16. Further, Dr. Kenneth W. Sanders, Bowman's medical expert, testified that in his opinion, based on reasonable medical probability, all of the problems Bowman has experienced with her lips and mouth were a result of the dog attack on June 24, 2012. Appx. 4; 1 R. Supp. R. Index, Video Deposition of Dr. Kenneth W. Sanders.[4]

The aggressive, protective, and possessive behaviors previously exhibited by Bubba led to this bite. 5 RR 87:14-25. Bubba was protecting Diana from the stranger of the group, Bowman. If Bubba would push Jerry away from Diana demonstrating

---

[4]For the Court of Appeals' convenience, in addition to citing to the video deposition included in the Reporter's Record in the Supplemental Exhibit Index, Bowman has also attached the line and page excerpt from Dr. Kenneth Sanders' deposition that Bowman is relying on and that was included in the video shown the jury in the Appellant's Appendix, Tab 4.

a low level of aggression, 5 RR 28:7-18, what would he do to someone he did not know who was leaning toward Diana: the answer is protect Diana by biting them.

Jerry Davidson:

> Q: and the mere fact of somebody leaning toward Diana, as far as we know, that could set the dog off?
> A: Right.

4 RR 140:3-5. Further, Bubba bit her on the right side of the face which is consistent with Bowman leaning over to speak with Diana. 4 RR 33:2-10. Bubba's dangerous propensities were a substantial factor in bringing about the bite and without which the bite would not have occurred. Accordingly, the evidence supports a finding of "yes" as to whether Bubba's dangerous propensities were the producing cause of Bowman's injury.

C.    Conclusion

It is clear from the record that Bubba had dangerous tendencies in that he was very protective of Diana and distrusting of new people. The circumstances of the night in question had Bowman, a newly introduced person to Bubba, sitting close to Diana at the dinner table with Bubba sitting directly in between them. Jerry testified that Bubba does not like anyone, including Jerry, to get too close to Diana. 4 RR 138:12-25, 139:5-7. Further, Bubba will stand his ground when he feels a threat to Diana. 4 RR 130:22-131:6. When Bowman leaned in toward Diana, Bubba saw Bowman trying to get close to Diana. Thus, the only evidence in the record to

33

explain the attack was Bubba's dangerous propensity for protectiveness and aggression toward strangers. Even the Judge of the trial court believed that Bubba's dangerous propensities were the producing cause of Bowman's injuries. 7 RR 9:11-15. Accordingly, if the Court finds the answer to Question No. 1 should be reversed, the record demonstrates the only acceptable answer to Question No. 2 is "yes." Therefore, Bowman asks the Court to enter such finding.

WHEREFORE, PREMISES CONSIDERED, Bowman prays the judgment be in all respects REVERSED with regard to dangerous propensities as to either or both the Davidsons and producing cause, and the cause be REMANDED back to the trial court for a determination of damages, for the reasons set forth herein.

In the alternative, Bowman prays the judgment be REVERSED as to either or both the Davidsons as to dangerous propensities and the cause be REMANDED back to the trial court for further proceedings, as the Court sees fit, for the reasons set forth herein.

Further and in the alternative, Bowman prays for the cause to be REMANDED back to the trial court for a new trial, if necessary.

Bowman prays for such other and further relief, general or special, in law or in equity, to which she may show herself to be justly entitled.

Respectfully submitted,

/s/Jack M. Sanders, Jr.
JACK M. SANDERS, JR.
109 East Houston Street
P.O. Box 1387
Marshall, Texas 75671-1387
(903) 935-7172
(903) 938-8616 (Fax)
sanders.jack@sbcblobal.net

ATTORNEY FOR APPELLANT

**<u>Certificate of Compliance</u>**

Pursuant to Tex. R. App. Pro. 9.4(i)(3), the undersigns hereby certifies that according to the word count function of the computer program used to generate the document, the portions of the Appellant's Brief subject to the rule contain  7,574  words total and that the text thereof is in 14 point Times New Roman font.

/s/Jack M. Sanders, Jr.
Jack M. Sanders, Jr.

35

## Certificate of Service

The undersigned hereby certifies that, pursuant to Tex. R. App. Pro. 9.5(a), a true and correct copy of the foregoing Appellant's Brief has been sent to the following counsel of record through the Court's on-line filing system, on this, the 19th day of March, 2015:

Alan E. Brown
Boyd & Brown, P.C.
1215 Pruitt Place
Tyler, Texas 75703
Counsel for the Appellees

/s/Jack M. Sanders, Jr.

Jack M. Sanders, Jr.

# CASE NO. 06-14-00094-CV

_____

IN THE SIXTH COURT OF APPEALS
TEXARKANA, TEXAS

_____

Nancy Elizabeth Bowman,

Appellant,

vs.

Jerry Davidson and
Diana Davidson,

Appellees.

_____

On Appeal from the 71st Judicial District
Harrison County, Texas
Cause No. 13-0618
The Honorable Brad Morin, Presiding

_____

**APPENDIX**

_____

JACK M. SANDERS, JR.
109 East Houston Street
P.O. Box 1387
Marshall, Texas 75671-1387
(903) 935-7172
(903) 938-8616 (Fax)
sanders.jack@sbcblobal.net
ATTORNEY FOR APPELLANT

37

# APPENDIX TABLE OF CONTENTS

DOCUMENTS                                                                    TAB

Judgment entered August 14, 2008.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Court's Charge.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Transcript Excerpts from the Video Deposition of Billy Strong . . . . . . . . . . . . . . 3

Transcript Excerpts from the Video Deposition of Dr. Kenneth Sanders. . . . . . . . 4

*Poznanski ex rel Poznanski v. Horvath*, 788 N.E.2d 1255 (Ind. 2003). . . . . . . . . . 5

*Deardoff v. Burger*, 606 A.2d 489 (Pa. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Robinson v. Marino*, 3 Wash. 434, 28 P. 752 (1892). . . . . . . . . . . . . . . . . . . . . . 7

Restatement (Second) of Torts § 509. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FILED FOR RECORD
HARRISON, COUNTY, TEXAS
CLERK DISTRICT COURT

2014 AUG 28 PM 4:35

MELINDA CRAIG
BY_____
DEPUTY

CAUSE NO. 13-0618

| NANCY ELIZABETH BOWMAN | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 71ST JUDICIAL DISTRICT |
| | § | |
| JERRY DAVIDSON and | § | |
| DIANA DAVIDSON | § | HARRISON COUNTY, TEXAS |

## JUDGMENT

On August 18, 2014, this cause came on to be heard in this court. Plaintiff Nancy Elizabeth Bowman appeared in person and by her attorney of record, Jack Sanders, and announced ready for trial. Defendants Jerry Davidson and Diana Davidson appeared in person and by his attorney of record, Alan E. Brown, and announced ready for trial. A jury having been previously demanded, a jury consisting of twelve qualified jurors was duly impaneled and sworn, and the case proceeded to trial. At the conclusion of the evidence, the Court submitted the questions of fact to the jury. The charge of the court and verdict of the jury are incorporated for all purposes herein by reference. Because it appears to the court that the verdict of the jury was for Defendants and against Plaintiff, judgment should be rendered on the verdict in favor of Defendants and against Plaintiff.

The court, after hearing the evidence and arguments of counsel, is of the opinion that Plaintiff should take nothing by this suit.

IT IS THEREFORE ORDERED BY THE COURT that Plaintiff take nothing by this suit and that all costs of court be taxed against Plaintiff.

_Judgment_                                                                  _Page 1_

4

All other relief not expressly granted in this Judgment is denied.

Signed this 26 day of Aug, 2014

JUDGE PRESIDING

APPROVED AS TO FORM:

By: _____
Alan E. Brown
State Bar No. 03090500
Attorney for Defendants

By: _____
Jack Sanders, Jr.
State Bar No. 17592000
Attorney for Plaintiff

FILED
AT _____ O'CLOCK ___ P.M.
_____
MELINDA CRAIG
CLERK DISTRICT COURT
HARRISON COUNTY, TEXAS
BY _____
DEPUTY CLERK

CAUSE NO. 13-0618

| | | |
|---|---|---|
| NANCY ELIZABETH BOWMAN | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 71ST JUDICIAL DISTRICT |
| | § | |
| JERRY DAVIDSON AND | § | |
| DIANA DAVIDSON | § | HARRISON COUNTY, TEXAS |

## COURT'S CHARGE

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1. Do not let bias, prejudice or sympathy play any part in your deliberations.

2. In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court, that is, what you have seen and heard in this courtroom, together with the law as given you by the Court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3. Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

1198

4. You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5. You will not decide an issue by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

6. You may render your verdict upon the vote of ten or more members of the jury. The same ten or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority or any other vote of less than ten jurors. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict, those jurors who agree to all findings shall each sign the verdict.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other juror who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When words are used in this charge in a sense which varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other definition or meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No". The term "preponderance of the evidence" means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. Whenever a question requires other than a "Yes" or "No" answer, your answer must be based on a preponderance of the evidence.

"Bowman" shall mean Nancy Elizabeth Bowman, plaintiff herein.

"Defendants" shall refer collectively to Jerry Davidson and Diana Davidson, defendants herein.

The "dog" shall mean and refer to Bubba, the male dog owned or possessed by Jerry Davidson and Diana Davidson.

The "occurrence in question" means the incident on June 24, 2012 when Bowman was bitten by the dog owned by Jerry Davidson and Diana Davidson.

# QUESTION NO. 1

On the occasion in question, did the Davidsons know or have reason to know that their dog had dangerous propensities not normal for a dog.

"Reason to know" means the actor has information from which a person of reasonable intelligence would infer that the fact in question exists, or that such person would govern his conduct under the assumption that such fact exists.

It is enough that the possessor of the animal knows that it has on other occasions exhibited such a tendency to attack human beings or other animals or otherwise to do harm as should apprise him of its dangerous character. Thus, the fact that a dog has to his knowledge unsuccessfully attempted to attack human beings or other animals is sufficient to bring its possessor within knowledge requirement. Sufficient also is any form of ill temper displayed in the presence of man or beast which would apprise a reasonable man that the animal if uncontrolled would make such an attack.

"Dangerous propensities" means vicious or aggressive tendencies that are not normal for a dog.

Answer "Yes" or "No".

Answer:     Jerry Davidson        _No_

            Diana Davidson       _No_

If you have answered "Yes" to Question No. 1, then answer Question No. 2 otherwise, do not answer Question No. 2

## QUESTION NO. 2

Was the animal's dangerous propensities the producing cause of the plaintiff's injury?

You are instructed that "PRODUCING CAUSE" means a cause that was a substantial factor in bringing about the injury, and without which the injury would not have occurred. There may be more than one producing cause.

Answer "Yes" or "No":

Answer: _____

## QUESTION NO. 3

If you answered "no" to Question 1, please answer the following question. Otherwise, do not answer the following question.

Did the negligence, if any, of Jerry Davidson or Diana Davidson in handling the dog proximately cause Bowman's injuries?

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Negligence" with regard to handling a dog, may include one who keeps a dog which possesses only those dangerous propensities which are normal to other dogs is required to know its normal habits and tendencies. He is, therefore, required to realize that even ordinarily gentle dogs are likely to be dangerous under particular circumstances and to exercise reasonable care to prevent foreseeable harm.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

In order for Bowman to be negligent, Defendants had to adequately warn Bowman.

An "adequate warning" is a warning that catches the attention of a person and conveys a fair indication of the nature and extent of the danger being warned against in the mind of a reasonably prudent person.

Answer "Yes" or "No".

Jerry Davidson      No

Diana Davidson      No

Bowman              No

## QUESTION NO. 4:

If you answered "yes" to Jerry Davidson or Diana Davidson and Bowman in Question No. 3, please answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found caused or contributed to cause the injury. The percentage you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to a person is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

For each person you found that caused or contributed to cause the injury, find the percentage of responsibility attributable to each:

a. Jerry Davidson     _____ %

b. Diana Davidson     _____ %

c. Bowman     _____ %

    Total     _____100_____ %

## QUESTION NO. 5

If you answered Questions No. 1 and No. 2 with "yes", please answer the following question. If you answered Question 3 with "yes" as to Jerry or Diana Davidson and with "no" as to Bowman or answered 50 percent or less as to Bowman in Question No. 4, then please answer the following question. Otherwise, do not answer the following question.

What sum of money, if paid now in cash, would fairly and reasonably compensate Bowman for her injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

a. Medical care expenses that, in reasonable probability, Bowman will incur in the future.

Answer:_____

b. Physical pain and mental anguish sustained in the past.

Answer:_____

c. Physical pain and mental anguish that, in reasonable probability, Bowman will sustain in the future.

Answer:_____

d. Disfigurement sustained in the past.

   Answer:_____

e. Disfigurement that, in reasonable probability, Bowman will sustain in the future.

   Answer:_____

f. Physical impairment sustained in the past.

   Answer:_____

g. Physical impairment that, in reasonable probability, Bowman will sustain in the future.

   Answer:_____

h. Loss of earning capacity sustained in the past.

   Answer:_____

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the presiding juror:

1. To preside during your deliberations;
2. To see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge;
3. To write out and hand to the bailiff any communications concerning the case which you desire to have delivered to the judge;
4. To vote on the issues;
5. To write your answers to the issues in the spaces provided; and
6. To certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all of the questions which you are required to answer under the instructions of the judge, and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into Court with your verdict.

_____
JUDGE PRESIDING

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____

Presiding Juror

(To be signed by those rendering verdict if not unanimous.)

| | |
|---|---|
| _Cindy Baldridge_ | _Dawn Murphy_ |
| _Janice Williams_ | _Aaron Knutsen_ |
| _Loretta Turlington_ | _Neal C. Merte_ |
| _Susan Robbi_ | _Jelly Carr_ |
| _Gary C. Anderson_ | |
| _Mark Oney_ | |

CAUSE NO. 13-0618

| | | |
|---|---|---|
| NANCY ELIZABETH BOWMAN, | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | HARRISON COUNTY, TEXAS |
| | ) | |
| JERRY DAVIDSON AND | ) | |
| DIANA DAVIDSON, | ) | |
| Defendants. | ) | 71ST JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL AND VIDEOTAPED DEPOSITION OF

BILLY STRONG

NOVEMBER 18, 2013

VOLUME 1 OF 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL AND VIDEOTAPED DEPOSITION OF BILLY STRONG, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 18th day of November, 2013 from 4:34 p.m. to 5:43 p.m., before Terri Lynn Smith, CSR in and for the State of Texas, reported by computerized stenotype machine, at the offices of Mr. Jack Sanders, Jr., 109 East Houston Street, Marshall, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Electronically signed by Terri Lynn Smith (601-237-608-4107)    16a5ed0f-8516-4c02-81cc-9c8298f78b4c

A P P E A R A N C E S

MR. JACK SANDERS, JR.
ATTORNEY AT LAW
109 East Houston Street
Marshall, Texas   75671
Telephone:   (903) 935-7172
Facsimile:   (903) 938-8616

     COUNSEL FOR PLAINTIFF:   Nancy Elizabeth Bowman


MR. ALAN E. BROWN
BOYD & BROWN, P.C.
1215 Pruitt Place
Tyler, Texas   75703
Telephone:   (903) 526-9000
Facsimile:   (903) 526-9001

     COUNSEL FOR DEFENDANTS:   Jerry Davidson and
                                  Diana Davidson


ALSO PRESENT:   Mr. Dart Leigh, videographer
                 Ms. Nancy Elizabeth Bowman

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

the face, he jumped up and got her there.

Q.   Okay.  So could you actually see the dog --

A.   Yes.

Q.   -- part of the dog when -- when he bit?

A.   Yes.

Q.   Okay.  Do you recall before the bite, I mean, was the dog making noise or doing anything, or was it just sort of out of the blue?

A.   No.  He was just sitting there.

Q.   Now, you said Ms. Bowman leaned, what, in the direction of the dog?

A.   Yes.

Q.   Now, would that have -- so if the dog's between Ms. Bowman and Diana, that -- she was then leaning in the direction also of Diana?

A.   Yes.

Q.   Had the dog, Bubba -- when I say "the dog," we're, at this point, talking about Bubba.  Okay?  We understand that?

A.   Yes.

Q.   All right.  Had Bubba bitten people, anybody before that you were aware of?

A.   Yes.

Q.   Okay.  Who?

A.   Me.

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q. Okay.

A. Okay. That's when I signed it.

Q. So -- so you told Jack or someone in his office --

A. Yes.

Q. -- about what happened, and somebody wrote it out and then you signed it saying, Yeah, that's --

A. Yes.

Q. -- that's what happened?

A. Yes.

Q. Okay. Okay. Now, when it says that -- what does it say? It says, I was bitten or the dog bit me. What's the language there?

A. "Nipped me on the back of my leg."

Q. Okay. Do you remember the occasion, sort of what -- I mean, were you just sitting around or can you -- do you remember what was happening that the dog did that?

A. Yes.

Q. What -- tell us -- tell us what occurred.

A. They had had a repairman there to work on their heater, and he had gotten up and left and forgot his bag of tools and was out in his car fixing to leave, and Diana asked me to take the bag of tools out. So I grabbed the tools and I took off at a trot towards the

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

front door, and Bubba got me.

Q. Okay.

A. He nipped me on the back of the leg.

Q. All right. Did -- did it break the skin?

A. No.

Q. Okay. Just left a red mark or --

A. Yeah; bruised, but....

Q. Okay. Did you seek any medical attention?

A. No.

Q. Okay. Do you remember when he did that, did Diana respond? Did she holler at the dog or anything? Do you remember?

A. Yes. She fussed at him.

Q. Okay. Other than that occurrence -- well, let me strike that.

Had you ever known Bubba to do that, actually, you know, bite, get ahold of somebody before?

A. No.

Q. Had you ever observed Bubba out working, messing with the cows?

A. Not really, no.

Q. Okay.

A. He doesn't go out there much.

Q. Okay. Now, do you know what breed of dog Bubba is?

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

know, I'm thinking, well, he nipped me, you know.

Q.   He might get somebody else?

A.   Yeah.  He might get somebody.  I've known him, you know, since he was brought there, a puppy, so....

Q.   How long was it from the time when he nipped you until he bit Ms. Bowman?

A.   Maybe a year.

Q.   Okay.

A.   That's a guess.

Q.   In that year or so, did any -- was there any other incident, anything else happen that made you any more concerned or was that sort of it?

A.   No.  That was it.

Q.   Okay.  Did Diana ever say anything to you after he bit you that she was more concerned or anything or --

A.   No.

Q.   Okay.  Does the -- does Bubba respond to Diana?  In other words, if Diana gives him a command or whatever, does the dog respond to Diana?

A.   Yes.

Q.   How about to Jerry?

A.   Yes.

Q.   Equally the same or more one than the other?

A.   I don't -- I couldn't tell you that.

Q.   Okay.

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

p.m.

(Break from 5:17 p.m. to 5:19 p.m.)

THE VIDEOGRAPHER: We're back on the record at 5:19 p.m.

EXAMINATION

BY MR. SANDERS:

Q. Mr. Strong, my name's Jack Sanders, and I represent Ms. Bowman. And to clarify, I came to see you, and you told me what happened, I wrote it down, and then you made some corrections, I think, where you initialed it and you signed that; is that correct?

A. Yes.

Q. Your statement. We're talking about No. --

A. That 4.

Q. -- No. 4?

A. Yes.

Q. All right, sir. Now, I have previously taken the deposition of Mrs. Davidson this morning, and we've talked about the bite that's mentioned there in Exhibit No. 4, and she says that she witnessed that -- that bite. Is that your recollection --

A. Yes.

Q. -- when the dog attacked you -- or bit you?

A. Yes.

Q. And I believe she described it as she had to

Electronically signed by Terri Lynn Smith (601-237-608-4107)            16a5ed0f-8516-4c02-81cc-9c8298f78b4c

A.    -- tell you the truth.

Q.    I was just wondering if it's as the dog aged he got more aggressive or more protective?

A.    I don't know. I think I've lived at that house longer than what I've thought. If he's 11 years old, I've been there longer than that, so....

Q.    Okay. That's what they said this morning. Looking back on this, what could have been done to avoid this accident?

A.    Well, the dog should have been put up, period.

Q.    All right. Now --

A.    For that fact.

Q.    Sir.

A.    It should have just been put up to avoid something like that.

Q.    All right. And -- and let me ask you this: Where you work, you're in maintenance?

A.    Yes.

Q.    Is safety a big element or aspect of your job?

A.    Yes, sir.

Q.    And -- and do you agree that if there's a dangerous situation, that it's the duty to warn about that dangerous situation; is that correct?

A.    Yes.

Q.    And if you can't adequately warn about that

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

dangerous situation, what's the next best thing?

A.   To stop it.

Q.   To do away with the --

A.   Do away --

Q.   -- dangerous situation?

A.   -- with the dangerous situation, yes.

Q.   All right.  So I guess is it fair to say that if the Davidsons couldn't adequately warn about Bubba, that they should have put him up?

A.   Yes.  He should have been put up.

Q.   All right.  Now, was there beer being consumed that day?

A.   Yes.

Q.   Do you know that anybody that consumed too much beer that day?

A.   I couldn't say about that.

Q.   All right.  And is the band still together playing?

A.   Occasionally.  We don't play all the time anymore.

Q.   All right.  And do you -- you say you go over there, did you say two or three times a week?

A.   I have been.  Here lately I have not been.

Q.   Okay.  Mr. Davidson said that there was a group, I think he said just about every day that comes

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

would have happened?

A. Yes.

Q. Right. Okay. But that evening do you recall any -- anybody raising any concern or the issue of putting the dog up that particular evening?

A. No. I don't -- I don't recall them saying put the dog up.

Q. And you observed nothing that you felt like would have put anyone on notice that, Hey, we better put the dog up because he's acting a certain way tonight?

A. No.

Q. Okay. And the dog's been out there a lot of times when you've been over there since this happened, right?

A. Yes.

Q. And you've never asked them to put the dog up when you've been over there, have you?

A. No.

Q. Okay. You haven't been concerned that he's going to bite you again or anything?

A. No.

Q. Okay. I mean, he could, right?

A. Yeah. He could, but --

Q. Okay. In other words, that's like what you said earlier about saying the dog's dangerous. Once he

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

bit you, obviously he bit at you, he might bite somebody else, right?

A. Yes.

Q. Okay. But you're still around the dog fairly frequently and have no real concerns about him attacking or biting you?

A. No. When Diana and Jerry leave to go -- or if they're going to go out of town, they call me, and I go over there and let the dogs out and all that stuff, so it's....

Q. Okay.

A. I have no concern about him biting me.

Q. So the -- am I correct that the only real thing that sort of changed since Ms. Bowman has been bitten is that now when new people or guests come over, they -- they put the dog up?

A. Yes.

Q. Because of what now has happened?

A. Yes.

MR. BROWN: Okay. All right. Okay. Thank you I pass the witness.

(Examination concluded at 5:40 p.m.)

EXAMINATION

BY MR. SANDERS:

Q. You say that on that particular night there was

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

CAUSE NO. 13-0618

NANCY ELIZABETH BOWMAN,           ) IN THE DISTRICT COURT OF
        Plaintiff,                )
                                  )
VS.                               ) HARRISON COUNTY, TEXAS
                                  )
JERRY DAVIDSON AND                )
DIANA DAVIDSON,                   )
        Defendants.               ) 71ST JUDICIAL DISTRICT


REPORTER'S CERTIFICATION
DEPOSITION OF BILLY STRONG
NOVEMBER 18, 2012

I, TERRI LYNN SMITH, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, BILLY STRONG, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That examination and signature of the witness to the deposition transcript was waived by the witness and agreement of the parties at the time of the deposition;

That the original deposition was delivered to Mr. Alan E. Brown;

That the amount of time used by each party at the deposition is as follows:

        Mr. Jack Sanders, Jr. - 00 hours, 20 minutes
        Mr. Alan E. Brown     - 00 hours, 45 minutes

Electronically signed by Terri Lynn Smith (601-237-608-4107)     16a5ed0f-8516-4c02-81cc-9c8298f78b4c

That $297.60 is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Jack Sanders, Jr., Attorney for Plaintiff, Nancy Elizabeth Bowman;

Mr. Alan E. Brown, Attorney for Defendants, Jerry Davidson and Diana Davidson.

That a copy of this certificate was served on all parties shown herein on 11/26/2013 and filed with the Clerk pursuant to Rule 203.3.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified on this the 25th day of November, 2013.

TERRI LYNN SMITH, Texas CSR
Expiration Date: 12/31/14
Deposition Resources, Inc.
Firm Registration No.: 409
515 North Church Street
Palestine, Texas 75801
Telephone: (903) 729-3289
Facsimile: (903) 727-0986

Electronically signed by Terri Lynn Smith (601-237-608-4107)

16a5ed0f-8516-4c02-81cc-9c8298f78b4c

NO. 13-0618

| NANCY ELIZABETH BOWMAN | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| V. | § | 71ST JUDICIAL DISTRICT |
| | § | |
| JERRY DAVIDSON and | § | |
| DIANA DAVIDSON | § | |
| Defendants. | § | OF HARRISON COUNTY, TEXAS |

VIDEOTAPED/ORAL DEPOSITION OF
KENNETH W. SANDERS, M.D.
MARCH 26, 2014

VIDEOTAPED/ORAL DEPOSITION OF KENNETH W. SANDERS, M.D., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 26th day of March, 2014, from 3:10 p.m. until 3:54 p.m., before Amanda J. Leigh, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at Knight and Sanders, 1811 East Bert Kouns Industrial Loop, Conference Room, Shreveport, Louisiana 71105, pursuant to the Texas Rules of Civil Procedure and the agreement(s) hereinafter set forth, if any.

COPY

A P P E A R A N C E S

FOR THE PLAINTIFF:

Jack Sanders, Jr., Esq.
LAW OFFICE OF JACK SANDERS, JR.
109 East Houston
Marshall, Texas 75670
Telephone: 903-925-7172

FOR THE DEFENDANTS:

Alan E. Brown, Esq.
BOYD & BROWN, P.C.
1215 Pruitt Place
Tyler, Texas 75703
Telephone: 903-526-9000

ALSO PRESENT:

Mr. Bobby Bryant, Videographer

feel the tongue.

There's no reason she shouldn't be able to feel the tongue--that's a completely different nerve--but I -- I think she must be thrusting the tongue to move the lip out of the way so she doesn't bite it, and she's biting the tongue. That's what I would think.

Q. Do you expect her to have any trouble speaking?

A. She does with some -- some sounds, I mean, just -- almost like a lisp type of a problem. when you can't get the lips to make the correct positioning to make -- to say the sounds, then you're going to have some -- some issues with that --

Q. And is that --

A. -- and that's -- that's what's going on: she's having a little trouble with the lips actually coming together or staying tight in certain areas when we make certain sounds; and so while she's doing that, then the sounds are going to not sound normal.

Q. Is it your opinion, based on reasonable medical probability, all of the problems that you have discussed is a result of this dog attack on June 24, 2012?

A. Yes.

Q.   And what is that opinion?  I asked you if you had an opinion, and you said yes --

A.   Oh.

Q.   -- and tell us...?

A.   The opinion that I -- okay, I'm sorry.  Ask me again.

Q.   Do you have an opinion as to whether all the problems that you've talked about here are a direct result of the dog bite or dog attack of June 24, 2012?

A.   Yes.  My opinion is that what I see on her now, around the mouth, is related to dog bites.

Q.   All right, sir.

Now, in your report, you talk about the cost of future surgery and scar revision.  Is that something that you -- do we need to talk about that, or are you going to tell her that she doesn't think -- are you telling her probably not going to help, or is that going to be kind of optional with her?

A.   At this point, probably the only one I would off -- if she really wanted to try, would be the lower lip, the mucosal advancement area; and we could redo that.  Basically cut that off and do another mucosal advancement.

Q.   And describe that surgery.

A.   We'd pull the lip back; make an incision on

NO. 13-0618

| NANCY ELIZABETH BOWMAN | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| V. | § | 71ST JUDICIAL DISTRICT |
| | § | |
| JERRY DAVIDSON and | § | |
| DIANA DAVIDSON | § | |
| Defendants. | § | OF HARRISON COUNTY, TEXAS |

REPORTER'S CERTIFICATE TO THE
VIDEOTAPED/ORAL DEPOSITION OF KENNETH W. SANDERS, M.D.
MARCH 26, 2014

I, Amanda J. Leigh, Certified Shorthand Reporter in and for the State of Texas, hereby certify:

That the witness, KENNETH W. SANDERS, M.D., was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That witness waived signature;

That $445.00 is the deposition officer's charges to counsel for the Plaintiff, for preparing the original deposition and any copies of exhibits;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition:

FOR THE PLAINTIFF:
TIME: 00:32
    Jack Sanders, Jr., Esq.
    LAW OFFICE OF JACK SANDERS, JR.
    109 East Houston
    Marshall, Texas 75670

FOR THE DEFENDANTS:
TIME: 00:11
    Alan E. Brown, Esq.
    BOYD & BROWN, P.C.
    1215 Pruitt Place
    Tyler, Texas 75703

          I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

          Certified to by me on this 9th day of April, 2014.

_____
Amanda J. Leigh, CSR 3791
Expiration:  12/31/2014
Firm Registration: 684
LEIGH & ASSOCIATES COURT
REPORTING AND VIDEO
Certified Shorthand Reporters
911 West Loop 281, Suite 211
Longview, Texas 75604
Telephone: (903) 295-2955
Facsimile: (214) 279-5900



Supreme Court of Indiana.
Alyssa POZNANSKI, a Minor, by her Parent and
Next Friend, Heather POZNANSKI and Heather
Poznanski, individually, Appellants (Plaintiffs),
v.
George HORVATH, Appellee (Defendant).

No. 71S03–0111–CV–592.
May 30, 2003.

Minor and her mother brought personal injury action against owner of mixed-breed sheep dog after dog bit minor. The Superior Court, St. Joseph County, R.W. Chamblee, Jr., J., granted summary judgment for owner. Minor and her mother appealed. The Court of Appeals reversed and remanded. Transfer was granted. The Supreme Court, Rucker, J., held that owner could not be held liable given lack of evidence that owner had any knowledge that dog exhibited dangerous or vicious propensities and absence of evidence that breed to which dog belonged exhibited such propensities.

Judgment of superior court affirmed in part and cause remanded.

Opinion, 749 N.E.2d 1283, vacated in part.

West Headnotes

**[1] Judgment 228 181(2)**

228 Judgment
  228V On Motion or Summary Proceeding
    228k181 Grounds for Summary Judgment
      228k181(2) k. Absence of Issue of Fact. Most Cited Cases
A genuine issue of material fact exists in summary judgment context where facts concerning an issue that would dispose of the litigation are in dispute or where the facts are capable of supporting conflicting inferences. Trial Procedure Rule 56(C).

**[2] Judgment 228 185(2)**

228 Judgment
  228V On Motion or Summary Proceeding
    228k182 Motion or Other Application
      228k185 Evidence in General
        228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases
On motion for summary judgment, any doubt as to a fact or an inference to be drawn is resolved in favor of the non-moving party. Trial Procedure Rule 56(C).

**[3] Appeal and Error 30 863**

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in General
      30k862 Extent of Review Dependent on Nature of Decision Appealed from
        30k863 k. In General. Most Cited Cases
Appellate court must carefully review a decision on a summary judgment motion to ensure that a party was not improperly denied its day in court. Trial Procedure Rule 56(C).

**[4] Animals 28 66.5(2)**

28 Animals
  28k66 Injuries to Persons
    28k66.5 Dogs
      28k66.5(2) k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
  (Formerly 28k68)
Act of unprovoked biting by a dog does not necessarily mean the dog is dangerous or vicious.

**[5] Animals 28 74(3)**

28 Animals
  28k66 Injuries to Persons
    28k74 Actions
      28k74(3) k. Presumptions and Burden of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

788 N.E.2d 1255
**(Cite as: 788 N.E.2d 1255)**

Proof. Most Cited Cases

Under common law, all dogs, regardless of breed or size, are presumed to be harmless domestic animals.

**[6] Animals 28 ⛌74(3)**

28 Animals
    28k66 Injuries to Persons
        28k74 Actions
            28k74(3) k. Presumptions and Burden of Proof. Most Cited Cases

Presumption that dog is harmless domestic animal is overcome by evidence of a known or dangerous propensity as shown by specific acts of the particular animal, with "dangerous propensity" being a tendency of the animal to do any act that might endanger the safety of persons or property in a given situation.

**[7] Animals 28 ⛌66.5(2)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(2) k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
    (Formerly 28k68)

Jury could reasonably conclude in negligence action against dog owner that dog at least exhibited dangerous, if not vicious tendencies, in biting victim who received hospital and medical attention including several stitches to her face.

**[8] Animals 28 ⛌74(3)**

28 Animals
    28k66 Injuries to Persons
        28k74 Actions
            28k74(3) k. Presumptions and Burden of Proof. Most Cited Cases

Jury may not reasonably infer, from a dog's exhibition of dangerous or vicious tendencies for the first time, that the dog's owner knew or should have known of those tendencies.

**[9] Animals 28 ⛌66.1**

28 Animals
    28k66 Injuries to Persons
        28k66.1 k. Duties and Liabilities in General. Most Cited Cases
    (Formerly 28k69)

When wild animals are kept as pets, an owner is liable for injuries caused by the animal, even if the owner had no prior knowledge of the animal's propensity to cause harm, and even if the owner has exercised the utmost care in preventing harm.

**[10] Animals 28 ⛌66.1**

28 Animals
    28k66 Injuries to Persons
        28k66.1 k. Duties and Liabilities in General. Most Cited Cases
    (Formerly 28k69)

In essence, strict liability is imposed on owners of wild animals for injuries caused by those animals.

**[11] Animals 28 ⛌66.2**

28 Animals
    28k66 Injuries to Persons
        28k66.2 k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
    (Formerly 28k70)

Owners of domestic animals may be held liable for harm caused by their pet, but only if the owner knows or has reason to know that the animal has dangerous propensities.

**[12] Animals 28 ⛌66.5(2)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(2) k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
    (Formerly 28k70)

Unlike with wild animals, when the owner of a dog has knowledge of its dangerous propensities, rules of liability are based upon negligence and not strict liability.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

788 N.E.2d 1255
**(Cite as: 788 N.E.2d 1255)**

**[13] Animals 28 ☞66.5(4)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(4) k. Contributory and Comparative Negligence. Most Cited Cases
    (Formerly 28k71)

**Animals 28 ☞66.5(6)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(6) k. Assumption of Risk. Most Cited Cases
    (Formerly 28k71)

Because action against owner to recover for injuries inflicted by dog is one sounding in negligence, the defenses of contributory negligence and assumption of risk are available to limit liability.

**[14] Animals 28 ☞66.5(2)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(2) k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
    (Formerly 28k70)

Where there is no evidence of an owner's actual knowledge that his or her dog has dangerous propensities, the owner may nonetheless be held liable provided there is evidence that the particular breed to which the dog belongs has dangerous propensities, even where the owner's dog has never before attacked or bitten anyone.

**[15] Animals 28 ☞66.5(2)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(2) k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
    (Formerly 28k70)

Jury could not infer that owner of mixed-breed sheep dog knew that dog was dangerous or vicious, and thus owner could not be held liable in negligence action for first-time bite by dog, where there was no evidence presented that owner had any knowledge that dog exhibited dangerous or vicious propensities and no evidence that breed to which dog belonged exhibited dangerous or vicious propensities.

**\*1257** Daniel H. Pfeifer, Jon A. Criss, Sweeney, Pfeifer, Morgan & Stesiak, South Bend, IN, Attorneys for Appellants.

Lynn M. Butcher, Don G. Blackmond, South Bend, IN, Attorneys for Appellee.

### CIVIL TRANSFER

RUCKER, Justice.

The question we address in this opinion is whether the very act of an unprovoked biting by a dog that in the past displayed no vicious tendencies is sufficient by itself for a jury to infer that the animal's owner knew, or should have known, of the dog's vicious tendencies. We grant transfer to hold that it is not.

### *Facts and Procedural History*

In this summary judgment action the following facts are not in dispute. George Horvath lives in South Bend and owned a mixed-breed sheepdog named Hey. The dog had never bitten anyone and was well behaved. No one had ever complained about Hey, and he did not usually wander out of Horvath's yard. On July 23, 1997, Horvath allowed Hey to remain outside unattended. The dog was neither on a leash nor confined by a fence. When Alyssa Poznanski and her mother walked by Horvath's home, Hey bit Alyssa without provocation. As a result Alyssa suffered a cut to her face requiring stitches. Among other things, a South Bend city ordinance provides in pertinent part "[e]very owner and/or his agent of an animal within the City shall see that his or her animal ... is properly restrained and not at large." Appellant's App. at 91. The ordinance defines "at large" as "any animal that is not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

788 N.E.2d 1255
**(Cite as: 788 N.E.2d 1255)**

under restraint." *Id.* at 92.

In her individual capacity and on behalf of Alyssa as next friend, Alyssa's mother (hereafter "the Poznanskis") sued Horvath for personal injuries and medical expenses. In response, Horvath filed a motion for summary judgment. Finding there was no genuine issue of material fact as to whether Horvath knew or should have known of any vicious tendencies of the dog, the trial court granted the motion. The Poznanskis appealed. On review, the Court of Appeals reversed and remanded, finding genuine issues of material fact remained regarding whether Horvath: (1) knew or should have known of the dog's vicious propensities; (2) used reasonable care in keeping the dog restrained; and (3) could be held liable under the local ordinance requiring proper restraint of animals. **\*1258** Horvath sought transfer, which this Court previously granted. *Poznanski v. Horvath,* 761 N.E.2d 423 (Ind.2001).

### Standard of Review

[1][2][3] Our standard of review is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Tom–Wat, Inc. v. Fink,* 741 N.E.2d 343, 346 (Ind.2001). A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the facts are capable of supporting conflicting inferences. *Woodward Ins., Inc. v. White,* 437 N.E.2d 59, 62 (Ind.1982). Any doubt as to a fact or an inference to be drawn is resolved in favor of the non-moving party. *Bader v. Johnson,* 732 N.E.2d 1212, 1216 (Ind.2000). We must carefully review a decision on a summary judgment motion to ensure that a party was not improperly denied its day in court. *Tom–Wat,* 741 N.E.2d at 346.

### Discussion

Relying on *Layman v. Atwood,* 175 Ind.App. 176, 370 N.E.2d 933 (1977), the Court of Appeals in this case concluded that Horvath could not be ab-

solved of liability simply because his dog had never before bitten anyone. According to the court, "the very fact that Hey bit Alyssa without provocation is evidence from which a reasonable inference can be made that Hey had vicious tendencies. Further, it may be inferred that if the dog had vicious tendencies based on this one incident, then similar to *Layman,* a question of fact exists as to whether Horvath knew or, at the least, should have known of these tendencies." *Poznanski v. Horvath,* 749 N.E.2d 1283, 1286 (Ind.Ct.App.2001).

In *Layman,* a father acting in his individual capacity and as next friend, sued Larry and Sherrod Atwood when their Saint Bernard bit the father's eight-year-old daughter. The Atwoods moved for summary judgment that was supported by affidavit. Among other things, the affidavit provided that the dog had always been an affectionate companion to the Atwood children and that prior to this incident had never bitten or harmed anyone in any way. *Layman,* 370 N.E.2d at 934. The trial court granted the motion. On review the Court of Appeals reversed. Noting that the dog-biting incident was unprovoked, the court held:

A jury could reasonably infer that the very act of unprovoked biting by the Atwoods' dog was evidence of that animal's vicious tendencies. If an animal does, indeed, have vicious tendencies a jury could reasonably infer that the animal's owner knew or, at least, should have known of those vicious tendencies.

*Id.* at 935.

[4][5][6][7] We first observe that the "very act of unprovoked biting" by a dog does not necessarily mean the dog is dangerous or vicious. Under our common law, all dogs, regardless of breed or size, are presumed to be harmless domestic animals. *Ross v. Lowe,* 619 N.E.2d 911, 914 (Ind.1993). This presumption is overcome by evidence of a known or dangerous propensity as shown by specific acts of the particular animal. *Id.* A dangerous propensity is a tendency of the animal to do any act that might

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

788 N.E.2d 1255
**(Cite as: 788 N.E.2d 1255)**

endanger the safety of persons or property in a given situation. *Id.* Thus, depending on the facts of a particular case, a dog's unprovoked biting may or may not be evidence of the dog's vicious tendencies. For example, although technically a "biting," a playful nibble on the hand is one thing, while a "teeth-baring" clamp on the arm is quite another. In any event, in this **\*1259** case the record shows that Hey either "bit" or "nipped" Alyssa in the face. Appellant's App. at 59. Regardless of the characterization, the incident resulted in Alyssa receiving hospital and medical attention including several stitches to her face. Under these circumstances a jury could reasonably conclude that Hey at least exhibited dangerous, if not vicious, tendencies.

[8] The question remains whether in light of a dog exhibiting dangerous or vicious tendencies for the first time, may a jury reasonably infer that the dog's owner knew, or at least should have known of those tendencies. If so, then this inference alone is enough to create a genuine issue of material fact to defeat a dog owner's claim that he or she was unaware of such tendencies. We conclude however that a jury may not make such an inference.

[9][10][11][12][13] When wild animals are kept as pets, an owner is liable for injuries caused by the animal. *Irvine v. Rare Feline Breeding Ctr., Inc.,* 685 N.E.2d 120, 125 (Ind.Ct.App.1997), *trans. denied.* This is so even if the owner had no prior knowledge of the animal's propensity to cause harm, and even if the owner has exercised the utmost care in preventing harm. In essence, strict liability is imposed on owners of wild animals. *Id.* Owners of domestic animals may also be held liable for harm caused by their pet but only if the owner knows or has reason to know that the animal has dangerous propensities. *Klenberg v. Russell,* 125 Ind. 531, 25 N.E. 596, 597 (1890) ( "[T]he owners of creatures which, as a species, are harmless and domesticated, and are kept for convenience or use, such as dogs ... are not liable for injuries willfully committed by them unless he is proved to have had notice of the inclination of the particular animals complained of to commit such injuries."); *see also Artificial Ice & Cold Storage Co. v. Martin,* 102 Ind.App. 74, 198 N.E. 446, 448 (1935). As with wild animals this liability also attaches regardless of the amount of care exercised by the owner. However, unlike with wild animals, when the owner of a dog has knowledge of its dangerous propensities, "[the] rules of liability are based upon negligence and not strict liability." *Alfano v. Stutsman,* 471 N.E.2d 1143, 1144 (Ind.Ct.App.1984) (quoting *Doe v. Barnett,* 145 Ind.App. 542, 251 N.E.2d 688, 694 (1969)). Because it is an action sounding in negligence, the defenses of contributory negligence and assumption of risk are available to limit this liability. *Borton v. Lavenduskey,* 486 N.E.2d 639, 642 (Ind.Ct.App.1985), *trans. denied.*

In certain instances, a cause of action in negligence can survive without the owner's actual knowledge of the animal's dangerous propensities. Indeed, such knowledge may even be constructive. *Doe,* 251 N.E.2d at 692. Nonetheless, when an owner does not know of his animal's dangerous propensities, the rule is not that the jury may infer or impute such knowledge. Rather, "the rule is that the owner is bound to know the natural tendencies of the *particular class* of animals to which [the] dog belongs." *Ross,* 605 N.E.2d at 788 (emphasis added). If the propensities of the class to which the dog belongs are the kind which one might reasonably expect would cause injury, then the owner must use reasonable care to prevent injuries from occurring. *Id.*

[14] Thus, where there is no evidence of an owner's actual knowledge that his or her dog has dangerous propensities, the owner may nonetheless be held liable provided there is evidence that the particular breed to which the dog belongs has dangerous propensities. And this is so even where the owner's dog has never before attacked or bitten anyone. *See, e.g.,* **\*1260***Holt v. Myers,* 47 Ind.App. 118, 93 N.E. 1002, 1002–03 (1911) (observing that the ferocious nature of a bulldog was sufficient to provide the owner with constructive notice of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

788 N.E.2d 1255
**(Cite as: 788 N.E.2d 1255)**

dog's dangerous propensities). In essence, a jury may not infer that an owner knew or should have known of a dog's dangerous or vicious propensities from the fact of a first time, unprovoked biting. Rather in such an instance, a jury may infer that the owner knew or should have known of the dog's dangerous or vicious propensities only where evidence shows that the particular breed to which the owner's dog belongs is known to exhibit such tendencies.

[15] In the case before us, there was no evidence presented that Horvath had any knowledge that Hey exhibited dangerous or vicious propensities. The record shows Hey was very well trained, behaved well, responded when Horvath called to him or told him to stay. Hey did not wander out of Horvath's yard or wander around the neighborhood. The record also shows that Horvath never received any complaints about Hey's conduct or behavior. And even though Horvath's home was near an elementary school, Hey did not get excited or nervous when he heard children playing, screaming or making loud noises. Nor was there any evidence presented to the trial court that the breed to which Hey belonged, a mixed-breed sheep dog, exhibited dangerous or vicious propensities. Accordingly, a jury could not infer that Horvath knew that his dog was dangerous or vicious.

On the question of whether there is any genuine issue of material fact that Horvath knew or should have known of Hey's vicious tendencies, we affirm the judgment of the trial court. The Court of Appeals' opinion on this point is thus vacated. We summarily affirm the Court of Appeals' resolution of the Poznanskis' claim that Horvath could be held liable under the local ordinance requiring proper restraint of animals.

### *Conclusion*
We affirm the judgment of the trial court in part. This cause is remanded for further proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON, SULLIVAN and

BOEHM, JJ., concur.

Ind.,2003.
Poznanski ex rel. Poznanski v. Horvath
788 N.E.2d 1255

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Superior Court of Pennsylvania.
Cathy A. DEARDORFF, Natural Mother and
Guardian of Jessica Deardorff, and Cathy A. Deardorff, Individually, Appellants,
v.
Carol BURGER, Appellee.

Argued Jan. 15, 1992.
Filed April 3, 1992.

Dog bite victim and mother brought action against owner. The Court of Common Pleas, Dauphin County, Civil Division, No. 2060 S of 1988, Schaffner, J., entered judgment on jury verdict in favor of owner. Plaintiffs appealed. The Superior Court, No. 00442 Harrisburg 1991, Popovich, J., held that: (1) theory of absolute liability was inapplicable; (2) single bite on prior occasion was insufficient to put owner on notice of dog's allegedly vicious propensity; and (3) alleged negligence of one owner could not be imputed to alleged co-owner.

Affirmed.

West Headnotes

**[1] Animals 28 ⚷66.5(2)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(2) k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
    (Formerly 28k70)
    Theory of absolute liability was inapplicable to action to recover for dog bite, even if owner had knowledge of dog's previous biting of another person.

**[2] Animals 28 ⚷66.2**

28 Animals

    28k66 Injuries to Persons
        28k66.2 k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
    (Formerly 28k70)
    Mere awareness and ownership of vicious animal does not per se expose one to liability for injuries inflicted absent failure on part of owner to take proper precautions to preclude that viciousness from exhibiting itself.

**[3] Animals 28 ⚷66.5(2)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(2) k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
    (Formerly 28k70)
    Single bite on prior occasion was insufficient to put owner on notice of dog's allegedly vicious propensity; there was lack of evidence concerning circumstances surrounding the prior bite.

**[4] Animals 28 ⚷66.5(7)**

28 Animals
    28k66 Injuries to Persons
        28k66.5 Dogs
            28k66.5(7) k. Persons Liable for Injuries in General. Most Cited Cases
    (Formerly 28k72)
    Alleged negligence of one owner of dog could not be imputed to alleged co-owner in action to recover for dog bite.

**490 *46 Theresa L. Shade Wix, Harrisburg, for appellants.

Kerry V. Smith, Harrisburg, for appellee.

Before McEWEN, POPOVICH and JOHNSON, JJ.

POPOVICH, Judge:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

In this appeal, we re-examine the law concerning the liability of dog owners for the actions of their pets. We are asked to review the June 26, 1991, order of the Court of Common Pleas of Dauphin County denying a motion for a new trial filed by the plaintiff/appellant, Cathy A. Deardorff, natural mother and guardian of Jessica Deardorff, individually.[FN1] We affirm.

> FN1. The June 26, 1991, order was reduced to judgment on July 11, 1991, and, thus, is appealable. Pa.R.App.P. 301(c).

In reviewing the denial of a motion for a new trial, this Court will reverse only when the lower court has clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case. *Lilley v. Johns-Manville Corp.,* 408 Pa.Super. 83, 596 A.2d 203 (1991).

With the preceding in mind, our review of the evidence discloses that, on the afternoon of November 16, 1986, 2-year-old Jessica, her father (David) and Shane Burger were in Shane's backyard raking leaves. Within 15 minutes of their arrival, Shane let the dog out of the house to roam in the backyard.

Shane recalled that the trio played in the leaves and Jessica ran toward the dog, a 75-pound German shepherd named "Smokey". Jessica was told by her father to "get **\*47** back" toward him. Shane offered to return the dog to the house, but the father did not feel it was necessary. The next thing to occur, as told by Shane, was that:

... [the child] was playing in the leaves. And she came upon [the dog] ... She hugged him around the neck and she was off to the side. And [the dog] tried ... to get away from her at that point in time....

... [I]t all happened so fast. [Shane] just saw Smokey pulling back. There was-if he would have bit Jessica, she probably would not have a face at this point in time. He's got quite a snout on him. He did yelp, okay, as he usually does when something's happening to him that he does not like. But [Shane] did not see [the dog], you know-there was no lunging at the child or anything like that. The dog veered back. She fell down, and we grabbed the kid and, you know, went because then we realized ... she's bleeding.... And it just happened like that, (indicating) that fast. [N.T. 54]

Jessica was taken to the hospital, sedated and received stitches "all over the face ... under the eye, over her eye [and] by her lip[.]" The child was released the same day. Within a month, the stitches were removed, and a scar remained above and below the child's left eye.

On June 13, 1988, a writ of summons was filed against Carol Burger, Shane's mother and the owner of the home in which the dog lived, for "negligently and carelessly restraining her dog." Paragraph 5. The plaintiff claimed damages in excess of $20,000 for the injuries sustained by the child "[d]ue solely to the negligence and carelessness of [Carol Burger]." Id. at 6. Following a two-day trial, the jury returned a verdict in favor of the defendant/Carol Burger. Post-trial motions were denied and an appeal to this Court ensued.

[1] The first claim of the appellant concerns the assertion that the trial court erred in refusing to charge the jury on the theory of absolute liability of a dog owner aware of the animal's vicious propensities and the resulting injuries incurred by someone bitten by the animal. This liability, **\*48** the appellant maintains, is absolute regardless of the circumstances of the accident and the exercise of any care or caution by the dog's owner.

The appellant cites Section 509 of the Restatement (Second) of Torts and *Mann v. Weiand,* 81\* Pa. 243 (1875) in support of her proposition. We find that the trial **\*\*491** court's instructions on negligence were sufficient and did not require the inclusion of an absolute liability charge given that Section 509 of the Restatement (Second) of Torts has yet to be adopted in this Commonwealth, a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

point which the appellant concedes in her brief at page 11.

With regard to the case of *Mann v. Weiand,* supra, a civil action for damages resulting from the defendant's *negligent* keeping of a ferocious dog, the court wrote:

We think one instance may show such unmistakable evidence of a vicious propensity as to make the owner of the dog, with notice, liable for any subsequent act of a similar character. The *gist* of the action for the subsequent misconduct of the dog, is for keeping it after knowledge of its vicious propensity: *May v. Burdett,* 9 Q.B., 101; *Wheeler v. Brandt,* 23 Barb., 324. It thereupon becomes the duty of the owner so to keep his dog as to guard against a repetition of similar misconduct. He is bound to secure it at all events, and is liable to parties afterwards injured if the mode he has adopted to secure it proves insufficient: Wood on Nuisance, section 763; *Jones v. Perry,* 2 Esp., 482; *Mason v. Keeling,* 12 Mod., 332. The principle on which this rule rests was held in *Mann v. Reed,* 4 Allen, 431, to be, that a ferocious animal, liable to do injury to men or property, is a nuisance, and that keeping it after notice of such liability is so wrongful, that the owner is chargeable for any neglect to keep it with such care that it cannot do any damage to a person who without any essential fault is injured thereby.

The same rule applies with reference to other nuisances: Wood on Nuisances, section 766; *Foish v. Sheet,* 221 Barb., 333; *Hughes v. McNamara,* 106 Mass., 281; *Marsh v. Jones,* 21 Vt., 378. Hence the keeping of a **\*49** vicious dog near a public highway, endangering the safety of persons passing thereon, is a nuisance, operating as an obstruction, and renders the person knowingly keeping it there liable to indictment, and also liable to an action in favor of any person injured thereby: *Granger v. Findley,* 7 Irish C.L.Rep., 417; Wood on Nuisance, section 768.

81* Pa. at 254. The reason for so holding was that an owner of a dog, after he had notice, was bound to secure it at all events, and failure to do so resulted in the owner's liability to persons injured thereafter. See *Commonwealth v. Carl,* 87 Pa.Super. 110, 112 (1925).

[2] In *Andrews v. Smith,* 324 Pa. 455, 188 A. 146 (1936), our Supreme Court had occasion to re-examine the question in the context of a compulsory non-suit. It wrote:

The theory upon which courts have so long ruled that liability for damages cannot be fastened upon the owner of a dog when that dog has bitten someone unless the owner knew of the dog's vicious propensities, is that it would be unfair to hold the owners of domestic animals that are normally harmless responsible for the vicious acts of these animals unless they were put on notice that the animal was vicious. *In so holding, the courts have merely applied the principle that no man is responsible for injuries caused by his property unless he himself was guilty of negligence in his manner of controlling or not controlling that property.*

\* \* \* \* \* \*

mere *ownership alone of inherently and apparently harmless property* does not carry with it liability for damages for an injury of which that property was the instrumentality.

\* \* \* \* \* \*

"Knowledge of the dangerous character of a thing is only the equivalent of foresight of the way in which it will act. If the thing is generally supposed to be universally harmless, and only a specialist would foresee that in a given case it would do damage, a person who did not foresee it **\*50** and who had no warning would not be held liable for the harm...."

The majority of the court below held that there is nothing in the Dog Law of May 11, 1921, P.L.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

522, as amended by the Act of May 6, 1927, P.L. 833, that rendered defendants liable to the plaintiff**492** for the injuries inflicted upon him by the former's dog. That act does not purport to change or affect in any way the rule that an owner's liability for the vicious acts of his dog cannot be predicated upon ownership alone but it must be based also on an owner's knowledge of his dog's viciousness and his failure then to take proper steps to prevent that viciousness displaying itself to the hurt of human beings.

324 Pa. at 459-460, 188 A. 146 (Emphasis added). Thus, it is clear from the *Andrews v. Smith* ruling, which made specific reference to and discussed *Mann v. Weiand,* that mere awareness and ownership of a vicious animal does not *per se* expose one to liability for injuries inflicted absent a failure on the part of the owner to take proper precautions to preclude that viciousness from exhibiting itself. Id.; but see *Darby v. Clare F. And R. Co.,* 111 Pa.Super. 537, 540, 170 A. 387 (1934).

More recently, this Court in *Miller v. Hurst,* 302 Pa.Super. 235, 448 A.2d 614 (1982) (en banc), had reason to decide whether a dog owner who permitted a dog to run free in violation of the Dog Law of 1965,[FN2] requiring that the dog be restrained, was liable, without further proof of negligence, for injuries caused when the dog bit a child.

> FN2. The Act of December 22, 1965, P.L. 1124, Art. VII, § 702, 3 P.S. § 460-702, repealed by The Dog Law of 1982, December 7, P.L. 784, No. 225, Art. I, § 101, 3 P.S. § 459-101 et seq. (Supp.1991).

We found that the Legislature enacted the statute to protect the public from personal injury, property damage and other hazards created by roving dogs. As a result, we:

> ... adopt[ed] the requirement of the statute as the standard for determining whether a person ha[d] complied with the common law duty to exercise ordinary care.

\* \* \* \* \* \*

**\*51** [We went on to hold that, a]lthough some states ha[d] gone further and imposed absolute liability for damages caused by roving dogs, we f[ou]nd it improvident and unnecessary to effect such a monumental change without legislative action. The legislature in Pennsylvania [was observed to] ha[ve] enacted a Dog Law which require[d] that owners of dogs prevent their animals from running at large, but it ha[d] not yet imposed absolute liability upon an owner who violate[d] such law. Therefore, we d[id] not usurp the function and prerogative of the legislature. We h[e]ld merely that violation of the legislatively enacted Dog Law is negligence per se.[8] This, we believe[d], [wa]s consistent with the intent of the legislature and also with the holdings of courts of other jurisdictions having similar laws.

-----

> FN8. A dog owner may always show that his or her dog escaped despite the exercise of due care. In such case, the roving of the dog would not constitute negligence.

Id., 302 Pa. Superior Ct. at 243-244 & n. 8, 448 A.2d at 618-619 & n. 8.

Likewise, the successor to The Dog Law of 1965 makes no provision for imposing absolute liability upon dog owners for failing to keep their dogs confined or controlled; to-wit:

**§ 459-305. Confinement of dogs**

It shall be unlawful for the owner or keeper of any dog to fail to keep at all times such dog either:

(1) confined within the premises of the owner;

(2) firmly secured by means of a collar and chain or other devise so that it cannot stray beyond the premises on which it is secured; or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(3) under the reasonable control of some person, or when engaged in lawful hunting, exhibition or field training.

The Act of December 7, 1982, P.L. 784, No. 225, Art. III, § 305, effective January 1, 1983, 3 P.S. § 459-305 (Supp.1991); see also *Andrews v. Smith,* supra.

**\*\*493 \*52** However, we do not rest our decision upon the absence of any provision in the present and past dog statutes to establish liability premised upon notions of absolute liability, for a person may rely on common law principles, in addition to statutory violations, to establish liability. See *Skowronski v. Bailey,* 330 Pa.Super. 83, 478 A.2d 1362, 1365 n. 3 (1984). Nonetheless, under either category, be it statute or common law principles, we are convinced that proof of negligence, in contrast to holding one absolutely liable, is the vehicle by which accountability for injury sustained because of a dog bite is to be established. See *Andrews v. Smith,* supra; *Miller v. Hurst,* supra.

Therefore, the trial court acted properly in refusing to instruct the jury that absolute liability was established once it was shown that the appellee had knowledge of Smokey's previous biting of one John Walmer. See *Andrews v. Smith,* supra; *Miller v. Hurst,* supra.

[3] The second argument proffered by the appellant suggests that the trial court erred in failing to instruct the jury that a single instance of vicious conduct on the part of a dog is sufficient to put its owner on notice of the dog's vicious propensities.

Again, we look to *Andrews v. Smith,* supra, for guidance in responding to the appellant's assertion; namely, the Court wrote:

"As soon as the owner knows or has good reason to believe that the animal is likely to do mischief, he must take care of him; it makes no difference whether this ground of suspicion arises from one act or from repeated acts. *The only restriction is*

*that the act done must be such as to furnish a reasonable inference that the animal is likely to commit an act of the kind complained of.*"

The minority judge in his dissenting opinion said that the "maxim that 'every dog is entitled to his first bite' is not supportable in law or justice." With this we agree. We do not understand that this maxim has ever found acceptance**\*53** in the courts of this Commonwealth. A dog may show ferocious propensities without biting anyone and if he does so, it is his master's duty to see to it that he is not afforded an opportunity to take a 'first bite.'

\* \* \* \* \* \*

Animals such as horses, oxen and dogs are not beasts that are ferae nature, i.e., wild beasts, but are classed as mansuetae natura, i.e., tamed and domesticated animals, and their owners are not responsible for any vicious acts of theirs unless the owners have knowledge that they are likely to break away from their normal domestic nature and become vicious. Of all animals, dogs have probably been the longest domesticated and the vast majority of them can be allowed their freedom without imperiling the public safety.

324 Pa. at 458, 459, 188 A. 146 (Emphasis added). Further, in *Mann v. Weiand,* supra, the Court observed that "one instance [of an attack by a dog] may show such unmistakable evidence of a vicious propensity as to make the owner of the dog, with notice, liable for any subsequent act of a similar character." 81\* Pa. at 254. Accord *Fink v. Miller,* 330 Pa. 193, 195, 198 A. 666 (1938).

Instantly, the testimony on the question of propensity was equivocal. For example, Shane Burger was told by the appellee of the incident in which Smokey bit a Mr. Walmer. However, he did describe how Mr. Walmer had been observed kicking Smokey on three occasions. During each episode, the dog, according to Shane, "back[ed] down" or "just ... jerked away" and made its way into the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

backyard with its tail between its legs. The dog never exhibited any signs of viciousness to Shane or Mr. Deardorff.

Also, Shane depicted Smokey as a "kind" animal-like a big puppy dog-who had never "snapped" at the witness or anyone else in its company.

The appellee described Smokey in terms similar to her son's account, e.g.,

> **\*54** He's a great dog. He has a great personality. He's actually very timid. If he does anything wrong, he's the kind of dog that if he does something wrong **\*\*494** he'll sit back and put his ears back...." [N.T. 69]

Smokey had played with other children without "any difficulties" and the animal was considered "just ... part of the family". In light of the preceding, the trial court gave the following charge to the jury:

> ... an important thing for you to decide is whether this dog, Smokey, had vicious propensities. The dictionary defines propensity as being an intense and often urgent natural inclination to do something. Therefore, in considering whether the dog has a propensity towards violence, you must determine whether the dog had an intentional and often urgent natural inclination to be vicious. It's the Plaintiff's burden to prove that the Defendant was negligent, and a part of that in this case is that this dog Smokey had dangerous propensities.

> Even if you find that Smokey was a dog with vicious or dangerous propensities, the Plaintiff must establish that Defendant Carol Miller knew that, that she had knowledge that her dog had those propensities. No matter how innocent the victim may be or how serious the injury sustained, the owner of the dog is not responsible for the consequences of the dog's bite if she has no reason to know the viciousness or dangerous propensities of the dog. [N.T. 85-86]

Consistent with the precepts espoused by the Court in *Andrews v. Smith,* supra, and *Mann v. Weiand,* supra, we find that, because of a lack of evidence concerning the circumstances surrounding the Walmer incident, it would have been improper for the trial court to have advised the jury, in unqualifying terms, that a single bite on a prior occasion was sufficient to put the appellee on notice of Smokey's alleged "vicious" propensity. See *Fink v. Miller,* supra.

Accordingly, since the appellant did not prove that Smokey had unmistakable vicious tendencies known to the appellee,**\*55** from the single bite of Mr. Walmer, she failed to make out a case warranting the single-bite instruction. Id.

[4] As to the last of the appellant's averments, we adopt the rationale of the lower court in response thereto as appropriate and proper under the facts and law; to-wit:

> Finally, the plaintiff contends that the Court erred in refusing to instruct the jury that the negligent acts of one co-owner of a dog may be imputed to the other co-owner of that dog. The plaintiff asserts that the Court should have told the jury that when individuals are engaged in a common enterprise, a mutual relationship of agency is created among them and that a finding of negligence regarding one of them will be imputed to the other. The plaintiff cites *DeVillars v. Hessler,* 363 Pa. 498, 70 A.2d 333 (1950) in support of this argument. The plaintiff concludes that such an instruction was warranted because the defendant and her son, Shane, were co-owners of "Smokey." Actually, in the present case, there was no allegation in the complaint that the defendant and her son were co-owners of the dog, or that the son was negligent. The testimony did establish the premise that mother and son were co-owners. Legally, the *DeVillars* case is no authority for the premise that one negligent owner of a dog makes the other owner responsible and we are satisfied now, as we were at the trial, that the suggested instruction was not proper in this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

case.

Lower Court Opinion at 8.

From our review of the evidence against the backdrop of the applicable law, we find that the jury's verdict was proper, and no error was committed by the trial court to justify the grant of a new trial.

Order affirmed.

Pa.Super.,1992.
Deardorff v. Burger
414 Pa.Super. 45, 606 A.2d 489

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

Supreme Court of Washington.
ROBINSON ET UX.
v.
MARINO.

Jan. 11, 1892.

Appeal from superior court, King county; T. J. HUMES, Judge.

Action by E. O. Robinson and Carrie Robinson, his wife, against S. Marino. There was judgment for plaintiffs, and defendant appeals. Affirmed.

HOYT, J., dissenting.

West Headnotes

**Animals 28 ⚷66.5(2)**

28 Animals
   28k66 Injuries to Persons
     28k66.5 Dogs
       28k66.5(2) k. Vicious Propensities and Knowledge Thereof. Most Cited Cases
   (Formerly 28k70)

Unless the owner of a dog knows that it has a savage disposition, and is accustomed to bite, he is not liable for injuries due to its bite.

**Animals 28 ⚷74(4)**

28 Animals
   28k66 Personal Injuries
     28k74 Actions
       28k74(4) k. Admissibility of Evidence. Most Cited Cases

Where the complaint alleged that the dog was of a ferocious disposition, and accustomed to bite or attempt to bite people, testimony as to particular instances when he had done so was proper.

**Animals 28 ⚷74(8)**

28 Animals
   28k66 Personal Injuries
     28k74 Actions
       28k74(8) k. Questions for Jury. Most Cited Cases

Evidence that the dog was kept chained; that when at large he had been known to attack people; and that defendant had said he was afraid the dog would break loose and hurt some one-warranted submitting to the jury the question as to the dog's ferocious disposition and the defendant's knowledge thereof.

**Appeal and Error 30 ⚷203.3**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
     30V(B) Objections and Motions, and Rulings Thereon
       30k202 Evidence and Witnesses
         30k203.3 k. Competency of Witnesses. Most Cited Cases
   (Formerly 30k203(3))

The competency of a witness will not be considered for the first time on appeal.

**Damages 115 ⚷127.11**

115 Damages
   115VII Amount Awarded
     115VII(B) Injuries to the Person
       115k127.11 k. Internal Injuries in General. Most Cited Cases
   (Formerly 115k131(3))

**Damages 115 ⚷127.15**

115 Damages
   115VII Amount Awarded
     115VII(B) Injuries to the Person
       115k127.12 Head and Neck Injuries in General; Mental Impairment
         115k127.15 k. Brain Injuries in General; Mental Impairment. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Formerly 115k131(3))

**Damages 115 ☞127.19**

115 Damages
 115VII Amount Awarded
  115VII(B) Injuries to the Person
   115k127.18 Arm, Hand, Wrist, and Shoulder Injuries
   115k127.19 k. In General. Most Cited Cases

(Formerly 115k131(3))

Where plaintiff had her arm bitten to the bone by a dog, and her side lacerated, and the nervous shock consequent upon the attack greatly prostrated her, a verdict for $800 was not so excessive as to be disturbed.

**Damages 115 ☞158(2)**

115 Damages
 115VIII Pleading
  115k156 Issues, Proof, and Variance
   115k158 Personal Injuries and Physical Suffering
   115k158(2) k. Consequences of Injury in General. Most Cited Cases

Where the allegations of a complaint were that the plaintiff, by reason of the bite of a dog, suffered great pain in body and mind, was prevented from attending to her household duties, and obliged to expend $50 for the services of a physician, and that she was damaged to the extent of $2,500, she was entitled, without any special allegation, to recover for all the direct and obvious results of the said injury, including physical pain and mental anguish.

**Evidence 157 ☞545**

157 Evidence
 157XII Opinion Evidence
  157XII(C) Competency of Experts
   157k545 k. Preliminary Evidence as to Competency. Most Cited Cases

In an action to recover for injuries occasioned by the bite of a dog, where a physician had testified that he treated two wounds for the plaintiff, it was proper to ask him whether he had sufficient knowledge to tell what probably caused the wounds.

**Negligence 272 ☞1635**

272 Negligence
 272XVIII Actions
  272XVIII(C) Evidence
   272XVIII(C)4 Admissibility
    272k1635 k. Similar Facts and Transactions; Other Accidents. Most Cited Cases
 (Formerly 272k125)

To show that a defect in property existed and caused a particular injury, evidence of other accidents or injuries occurring about the same time and place from the same or similar cause is admissible.

**\*\*752 \*435** *White & Munday,* for appellant.

*T. H. Cann* and *Battle & Shipley,* for respondents.

ANDERS, C. J.

This was an action brought by respondents, as husband and wife, to recover damages for injuries inflicted upon the plaintiff Carrie Robinson by a dog owned and kept by appellant. On the trial one Dr. Hilton, a witness for plaintiff, having testified that he treated two wounds on plaintiff, which he described, was asked this question: "From your knowledge as a surgeon and general practitioner, can you tell what the probable cause of those wounds was?" The question was objected to by defendant on the ground that the same was incompetent, and was not in the nature of expert testimony. The court overruled the objection, and exception was duly taken and allowed, and this ruling **\*436** of the court is assigned as error. Appellant also insists that the witness was not shown to be competent to testify as an expert, but it is a sufficient answer to this objection to state that the point was not raised in the court below, and cannot be urged for the first time here. We must therefore assume that the witness was competent. Indeed, the competency of the witness as an expert is sufficiently disclosed by the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

record, for it is there shown that he had been a practicing physician and surgeon for 20 years, and was still practicing as such at the time of the trial. Physicians and surgeons of experience are presumed to be acquainted with all matters pertaining to their profession, and to be competent to testify concerning the same. Rog. Exp. Test. (2d Ed.) 43, 99. And that a medical expert may give an opinion as to the means by which a particular wound was inflicted is the prevailing doctrine of the courts. Id. 127, 128, and cases cited. But the question here objected to called for no opinion whatever except as to whether the witness had sufficient knowledge to tell what probably caused the wounds described. He was not asked to state what caused them, or even what probably caused them. The question was preliminary in its nature, and the objection was properly overruled. But, even if it was error to permit the question to be propounded to the witness, we think the judgment should not be reversed, as the defendant could not have been prejudiced thereby. It was clearly shown by other competent testimony in the case that the plaintiff Mrs. Robinson was bitten by defendant's dog, and that whatever injuries she suffered resulted therefrom. The admission of incompetent testimony under such circumstances would not justify us in reversing the judgment of the trial court. Brown v. Forest, 1 Wash. T. 201.

Appellant also insists that it was error to permit the witness Addie Simons to testify to particular instances of *437 the action of the dog in question, for the reason that no testimony had been offered to show that defendant had any knowledge of the same, and that it was not competent to prove the disposition of the dog by such testimony. We think the objection cannot be sustained. It was alleged in the complaint that the dog was of a ferocious and mischievous disposition, and accustomed to attack and bite mankind; and it is quite evident that that fact could not be more readily made manifest than by testimony descriptive of his actions. Whether or not the dog was vicious was one of the principal issues to be determined by the jury, and it was certainly competent to show that previously to the occasion on which he attacked Mrs. Robinson he had bitten or attempted to bite another person.

It is alleged in the brief of appellant that the evidence on behalf of the plaintiffs failed to show that the dog was of a ferocious disposition, and failed to show that defendant had notice or knowledge of such disposition, and failed to show any negligence on the part of the defendant in suffering the dog to be at large; and it is therefore contended that defendant's motion for a nonsuit should have been granted. But we are of the opinion that there was sufficient testimony to go to the jury upon each of the points made by counsel. Several witnesses for the plaintiffs had testified that the dog had always been kept chained, which was strong evidence that he was ill-disposed; and that **753 he would bark and jump at persons going near him while tied, and endeavor to get loose. The plaintiff Mrs. Robinson testified that she had lived on the opposite side of the street from the residence of the defendant for about three years, and that she had known the defendant's dog during that time, and that on the morning of November 2, 1890, she went to the house of defendant to get vegetables, as she had been accustomed to do; that when she got to the corner of the house the dog was lying with his nose on the *438 door-step, which she thought was something unusual, and sprang upon her and bit and bruised her badly, and bit her arm to the bone; and Mrs. Simons had testified that on one occasion, and the only time she ever saw the dog at large, she saw him run after and seize hold of a woman's dress as she ran out through the gate; and Mr. Peterson had testified that the defendant stated to him the summer before that he was afraid that his dog would get loose and bite his (Peterson's) child, because she was in the defendant's garden so much. With such testimony before it, the court would not have been justified in granting defendant's motion. The owner of a domestic animal is not liable, in the absence of statutory provision, for any injury it may inflict upon others, unless he has notice of its inclination to commit such an injury. But, according to the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

more modern and more reasonable doctrine, it is not necessary that he should have had actual positive notice. If he has notice that the disposition of the animal is such that it would be likely to commit an injury similar to the one complained of, it is sufficient. It is not necessary that the notice be of injury actually committed. Thus, in case of a dog known to be vicious and ferocious by its keeper, it is unnecessary to show that he had previously bitten any person. The keeper of such a dog must see to it that he is kept securely, or be responsible for all injury done by him. Cooley, Torts, (2d Ed.) 404, 405; 2 Shear. & R. Neg. (4th Ed.) § 630; Flansburg v. Basin, 3 Ill. App. 531; Godeau v. Blood, 52 Vt. 251. In the case last cited, REDFIELD, J., said: "The duty which the law casts upon the keeper of a dangerous and malicious domestic animal is but the enforcement of a common moral duty, binding upon all men, that a man should so keep and use his own property as not to wrong and injure others. The formula used in text-books and in forms given for pleadings in such cases-'accustomed **\*439** to bite'-does not mean that the keeper of a ferocious dog is exempt from all duty of restraint until the dog has effectually mangled or killed at least one person. But, as he is held to be a man of common vigilance and care, if he had good reason to believe from his knowledge of the ferocious nature and propensity of the dog that there was ground to apprehend that he would, under some circumstances, bite a person, then the duty of restraint attached, and to omit it was negligence." In this case it was not shown that the defendant had any knowledge that the dog had ever attacked or bitten any person before he attacked the plaintiff, but we think it was fairly shown that he knew, or should have known, that the disposition of the dog was such as to make it highly probable that he would bite some one in case he should ever break his fastening or be untied, and it was therefore the duty of the defendant to effectually restrain him. 2 Shear. & R. Neg. § 628. And the fact that he endeavored to do so, and that the dog broke loose, or was untied by some other person, and without his consent or knowledge, will not, of itself, exempt him from liability

for injury inflicted by the dog while so at large. Partlow v. Haggarty, 35 Ind. 178; Wilkinson v. Parrott, 32 Cal. 102; Muller v. McKesson, 73 N. Y. 195. In Muller v. McKesson, 73 N. Y. 195, it was held that, in an action against the owner of a ferocious dog for injuries inflicted by it, proof that the animal is of a savage and ferocious disposition is equivalent to express notice. And it has even been held that the knowledge of the wife is the knowledge of the husband in such cases. 2 Shear. & R. Neg. § 630, note.

The defendant testified in his own behalf that the reason he always kept the dog chained was to prevent him from following his team as he went around town selling vegetables. He also stated that he did not recollect ever telling Peterson he was afraid his dog would bite his child, **\*440** and did not think he so stated, and that he never was afraid the dog would bite anybody, and that the dog had never before bitten any one, and that no one had ever complained of the dog to him. Defendant's wife also testified that the dog never bit any person before, but neither of them contradicted the testimony of plaintiff's witnesses that he was "cross," and would jump at persons while chained, and would try to get loose. The court properly instructed the jury upon the law applicable to the case, and specially charged them that before plaintiffs could recover in the action they must be satisfied by a preponderance of the evidence that the defendant had knowledge that the dog was of a ferocious and mischievous disposition and accustomed to attack and bite mankind. The jury must have found, upon all the facts and circumstances in evidence, that defendant had such knowledge; and we cannot say that their verdict was unwarranted by the evidence, and therefore find no error in the refusal to grant a new trial.

Appellant further contends that plaintiffs were not entitled, upon the pleadings and evidence, to a verdict for more than the amount paid for medicines and medical attendance. It is claimed that there is no sufficient allegation of special damage

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the complaint, and no proof whatever of the value of plaintiff's services or of the amount of damage sustained by her; that whatever damages she sustained were not the necessary consequences of her injuries,-were, therefore, special, and consequently not recoverable in this action because not alleged. It is true that there is no proof of the value of plaintiff's services, and it is therefore reasonable to presume that the jury awarded no damage**\*\*754** on that account. But we think the learned counsel for appellant are in error in assuming that under the allegations of the complaint no damages can be recovered except the amount shown to have been paid for medical services and medicine. The complaint alleges **\*441** "that the said dog, while in the wrongful keeping of defendant as aforesaid, and wrongfully and negligently suffered by defendant to go at large without being properly guarded and confined as aforesaid, attacked and bit plaintiff Carrie Robinson on the arm and wrist and on her side, thereby severely wounding and injuring her, said plaintiff, whereby she suffered, and still suffers, great pain of body and mind, and thereby was prevented for the period of five days from attending to her household duties, and was obliged to and did expend the sum of $50 for medicines and the services of a physician in the endeavor to heal herself of said wounds and injuries; that by reason of said wounds and injuries plaintiffs have been damaged in the sum of $2,500." It is a well-settled principle of law that damages which are the natural and necessary result of an injury need not be specially pleaded. The plaintiffs had a right, under the allegations of the complaint, to recover a fair compensation for all the direct and obvious results of the injuries received, including physical pain and mental anguish. Such damages are implied by law, and need not be specially alleged. 3 Sedg. Dam. (8th Ed.) p. 586; 3 Suth. Dam. 715; Curtis v. Railroad Co., 18 N. Y. 534, Tyson v. Booth, 100 Mass. 258. And no doubt the jury, in estimating the damages, took into consideration, as they had a right to do, not only the physical and mental suffering of plaintiff, but also the effect produced upon her nervous system as shown by the evidence, and for which she was

treated by her physician for some six weeks after the wounds upon her person had healed.

It is further contended by appellant that the verdict for $800 is excessive. We cannot agree with counsel for appellant that the injuries received by plaintiff were altogether of a trifling character. The wound upon her wrist, while only about the diameter of an "eight-penny nail," penetrated to the bone. Her dress and corset were bitten through, and her side lacerated for the space **\*442** of three-quarters of an inch and to the depth of a quarter of an inch. But her greatest injury resulted from the fright and mental terror, and the nervous shock produced by the unprovoked, sudden, and unexpected attack upon her by this savage and infuriated beast. She says she was rendered so nervous that she could scarcely sleep for some time afterwards; and, according to the testimony of her husband, when she heard the dog barking, as she often did, she was so terrified that he was afraid she would go into convulsions. And there was testimony tending to show that she was still suffering from nervousness at the time of the trial. It is impossible to lay down any precise rule for measuring the damages in cases like the one at bar, and the amount of the recovery must of necessity be left to the sound discretion and judgment of the jury, subject to be revised by the court when it clearly appears to be excessive. While the amount of the verdict may seem large, we cannot say that it is so disproportionate to the injury as to indicate that it was the result of passion or prejudice on the part of the jury, and we therefore see no reason for disturbing it.

The judgment of the court below is affirmed.

DUNBAR, STILES, and SCOTT, JJ., concur.

HOYT, J.
I dissent.

Wash. 1892.
Robinson v. Marino
3 Wash. 434, 28 P. 752, 28 Am.St.Rep. 50

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

3 Wash. 434, 28 P. 752, 28 Am.St.Rep. 50

**(Cite as: 3 Wash. 434, 28 P. 752)**

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Restatement of the Law - Torts
Database updated March 2015

Restatement (Second) of Torts
Division
Three. Strict Liability
Chapter
20. Liability of Possessors and Harborers of Animals
Topic
2. Harm Caused by Animals Otherwise Than by Trespass by Livestock

**§ 509 Harm Done by Abnormally Dangerous Domestic Animals**

Comment:
Reporter's Note
Case Citations - by Jurisdiction

**(1) A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm.(2) This liability is limited to harm that results from the abnormally dangerous propensity of which the possessor knows or has reason to know.**

**Comment:**

*a.* The general rule stated in this Section is subject to a number of exceptions and qualifications, too numerous to state in a single Section. The Section should therefore be read together with § 510, on the effect of an unforeseeable act of a third person, another animal or a force of nature; § 511, on liability to trespassers, as to which there is in turn a qualification in § 512; § 515, on assumption of risk and contributory negligence; § 516, on watchdogs; and § 517, on acts done in performance of a public duty.

*b.* The phrase "has reason to know" here as elsewhere in the Restatement means that the person in question knows or from facts known to him should know. (See § 12).

*c. Animals dangerous although not vicious.* In the usual situation to which the rule stated in this Section is applicable the animal is vicious, that is, has a tendency to attack human beings or other animals that is abnormal in animals of its class. The rule is also applicable if the animal is not vicious but has a dangerous tendency that is unusual and not necessary for the purposes for which such animals are usually kept. Thus one who keeps a large dog that he knows to be accustomed to fawn violently upon children and adults is liable under the rule stated in this Section for harm done by its dangerous playfulness or over-demonstrative affection. This is also true of one who keeps a dog that he knows to have an abnormal tendency to destroy crops and other vegetation.

*d. Rationale.* One who keeps a domestic animal that to his knowledge is vicious, or which though not vicious possesses dangerous propensities that are abnormal thereby introduces a danger not usual to the com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

munity and which, furthermore, is not necessary to the proper functioning of the animal for the purposes that it serves. On the other hand, those who keep domestic animals such as bulls and stallions that are somewhat more dangerous than other members of their species do not introduce any unusual danger, since the somewhat dangerous characteristics of these animals are a customary incident of farming and the slightly added risk due to their dangerous character is counterbalanced by the desirability of raising livestock.

*e. Animals in which dangerous propensities are normal.* There are certain classes of domestic animals in which dangerous propensities are normal although abnormal in other classes of their species. Bulls are more dangerous than cows and steers; stallions are more dangerous than mares and geldings; rams are more dangerous than ewes and lambs. However, these animals have been kept for stud purposes from time immemorial so that the particular danger involved in their dangerous tendencies has become a normal incident of civilized life. This, together with the fact that the virility which makes them dangerous is necessary for their usefulness in performing their function in the socially essential breeding of livestock, justifies the risk involved in their keeping. Therefore, the law has not regarded bulls, stallions and rams as being abnormally dangerous animals to be kept under the strict liability stated in this Section. So, too, certain kinds of livestock are less gentle than others. Thus Burma cattle are more wild and dangerous than most other breeds. However, since Burma cattle have been recognized as socially desirable animals, this addition to the normal dangerous characteristics of cattle is not enough to make them abnormally dangerous. Although one who keeps these animals is not subject to the strict liability stated in this Section, he is liable unless he exercises in their custody care commensurate with their normal dangerous characteristics. On the other hand, although a certain amount of danger is inseparable from the keeping of these socially essential or useful animals, there is no social value in keeping animals that are vicious or have other dangerous propensities that are in excess of those necessary for their utility and are abnormal to their class.

*f. Dogs.* Although dogs, even hunting dogs, have no material utility comparable to cattle, horses and other livestock, they have from time immemorial been regarded as the friends and companions of man. The great majority of dogs are harmless, and the possession of characteristics dangerous to mankind or to livestock is properly regarded as abnormal to them. Consequently the possessor of a dog is not liable for its biting a person or worrying or killing livestock unless he has reason to know that it is likely to do so.

Statutes frequently abolish the necessity of scienter and impose strict liability for all harm caused to human beings and livestock by dogs. Even in the absence of a statute the possessor of a dog known by him to be vicious is liable for harm caused by it although he has exercised the utmost care to prevent it. As to the privilege to use dogs to protect property from intrusion, see § 516. As to the liability to trespassers generally, see §§ 511 and 512.

*g. Knowledge of dangerous propensities—scienter.* It is not necessary to the application of the rule stated in this Section that the possessor of the domestic animal know of its abnormally dangerous propensities; it is enough that he has reason to know of them. Thus it is not necessary that he know that it has previously attacked human beings or animals or has done harm by being over-violent in play or by digging up vegetation. A dog is not necessarily regarded as entitled to one bite. It is enough that the possessor of the animal knows that it has on other occasions exhibited such a tendency to attack human beings or other animals or otherwise to do harm as should apprise him of its dangerous character. Thus, the fact that a dog has to his knowledge unsuccessfully attempted to attack human beings or other animals is sufficient to bring its possessor within the rule stated in this Section. Sufficient also is any form of ill temper displayed in the presence of man or beast that would apprise a reasonable person that the animal if uncontrolled would make an attack. It is not enough, however, that the pos-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sessor of the animal has reason to know that it has a propensity to do harm in one or more specific ways; it is necessary that he have reason to know of its propensity to do harm of the type that it inflicts.

> **Illustrations:**
> **Illustrations:**1. A keeps a dog, which he knows to be in the habit of running after automobiles and yapping at their wheels. A chains the dog in his yard. The dog escapes, without any negligence on the part of A, runs into the street, and barks at the wheels of B's passing automobile. The dog is caught under one of the wheels, B's car is thrown into the ditch, and B is injured. A is subject to liability to B under this Section.2. A keeps a dog in his apartment on the second floor. A knows that the dog is in the habit of rushing at the window and leaning out of it in order to bark at pedestrians passing below. The dog rushes to the window to bark at B, loses its footing, and falls on B and injures him. A is subject to liability to B under this Section.

*h. Knowledge of servant.* It is not necessary for the possessor of a domestic animal himself to have reason to know of its abnormally dangerous propensities; it is enough that a servant to whom he has entrusted its custody has reason to know of it. (See the Restatement, Second, Agency § 283).

*i. Harm resulting from dangerous propensity.* The strict liability stated in Subsection (1) extends only to such harm as results from the abnormally dangerous propensity of the animal, of which the possessor knows or has reason to know. The basis of his liability is that by keeping the animal with knowledge, or reason to know, of the abnormal propensity he has exposed those in his vicinity to an abnormal risk. His strict liability is therefore limited to the scope of that risk. He may still be liable for any negligence in keeping the animal or in dealing with it, which results in other harm; but in the absence of knowledge he is not liable for harm not reasonably to be expected in the light of his knowledge.

Thus one who keeps a vicious dog, knowing that it has a propensity to bite, is not liable when the dog lies down in the street and is run over by an automobile, with resulting harm to the driver of the car, unless he has in some way been negligent in failing to prevent the occurrence. If the dog bites a man, he is liable even in the absence of negligence. Knowledge, or reason to know, that an animal has a tendency to attack or fight with other animals is not necessarily knowledge or reason to know that it will attack human beings. If the possessor knows that his dog has the playful habit of jumping up on visitors, he will be liable without negligence when the dog jumps on a visitor, knocks him down and breaks his hip; but he is not necessarily liable when the dog unexpectedly bites a postman, when he never has shown any inclination to do so before. Knowledge of one propensity may under particular circumstances give reason to know that the animal is likely to do something reasonably similar, even though he has not yet done it. Thus a horse that has attempted to bite persons in its vicinity may fairly be regarded as equally likely to kick them if afforded the opportunity.

**Reporter's Note**

This Section has been changed by the addition of Subsection (2).

In support of the rule stated in Subsection (1) see: Zarek v. Fredericks, 138 F.2d 689 (3 Cir.1943); Vigue v. Noyes, 113 Ariz. 237, 550 P.2d 234 (1976); Strange v. Stovall, 261 Ark. 53, 546 S.W.2d 421 (1977); Barger v. Jimerson, 130 Colo. 459, 276 P.2d 744 (1954); Farrior v. Payton, 57 Haw. 620, 562 P.2d 779 (1977); Tamburello v. Jaeger, 249 La. 25, 184 So.2d 544 (1966); Bachman v. Clark, 128 Md. 245, 97 A. 440 (1916); Papke v. Tribbey, 68 Mich.App. 130, 242 N.W.2d 38 (1976); Harris v. Breezy Point Lodge, 238 Minn. 322, 56 N.W.2d 655 (1953); Humes v. Salerno, 351 S.W.2d 749 (Mo.1961); Emmons v. Stevane, 77 N.J.L. 570, 73 A. 544

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.